IN THE SUPREME COURT OF NORTH CAROLINA

2022-NCSC-77

No. 442PA20

Filed 17 June 2022

STATE OF NORTH CAROLINA

v.

JAMES RYAN KELLIHER

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision of the Court of Appeals, 273 N.C. App. 616 (2020), reversing a judgment entered 13 December 2018 by Judge Carl R. Fox in Superior Court, Cumberland County. On 10 March 2021, the Supreme Court allowed defendant's conditional petition for discretionary review as to additional issues. Heard in the Supreme Court on 10 November 2021.

*Joshua H. Stein, Attorney General, by Kimberly N. Callahan, Special Deputy Attorney General, for the State-appellant.*

*Glenn Gerding, Appellate Defender, by Kathryn L. VandenBerg, Assistant Appellate Defender, for defendant-appellee.*

*Lisa Grafstein, Susan H. Pollitt, and Luke Woollard for Disability Rights North Carolina, amicus curiae*

*Christopher J. Heaney, Emily A. Gibson, and Margaret P. Teich for North Carolina Advocates for Justice, amicus curiae.*

EARLS, Justice.

¶ 1    When a child commits a murder, the crime is a searing tragedy and profound

societal failure. Even a child has agency, of course; we do not absolve a child of all culpability for his or her criminal conduct. But there are different considerations at issue when sentencing a juvenile offender as compared to an adult criminal defendant. "[C]hildren are different" than adults in ways that matter for these purposes. *State v. James*, 371 N.C. 77, 96 (2018) (quoting *Miller v. Alabama*, 567 U.S. 460, 480 (2012)). A child's actions necessarily reflect that child's "chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences." *Miller*, 567 U.S. at 477. A child's actions also reflect the "environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional." *Id.* What a child's actions do not reflect, in the vast majority of cases, is that child's permanent and fundamental depravity, or what the United States Supreme Court has described as "irreparable corruption." *Roper v. Simmons*, 543 U.S. 551, 573 (2005). Given these unique attributes that define childhood, both the North Carolina and United States Constitutions impose limits on the use of our most severe punishments for juvenile offenders, even for those children who have committed the most egregious crimes imaginable.

¶ 2     On 7 August 2001, James Ryan Kelliher participated in the killing of Eric Carpenter and his pregnant girlfriend, Kelsea Helton. Kelliher was seventeen years old. At the time he was indicted, juveniles were still subject to the death penalty, and

the State indicated its intent to try Kelliher capitally. Kelliher pleaded guilty to various charges including two counts of first-degree murder, for which he was ordered to serve two consecutive sentences of life without parole. After the United States Supreme Court issued its decision in *Miller v. Alabama*, 567 U.S. 460 (2012), the trial court conducted a resentencing hearing, during which the court expressly found that Kelliher was "a low risk to society" who was "neither incorrigible nor irredeemable." Nevertheless, the trial court ordered Kelliher to serve two consecutive sentences of life with the possibility of parole. Each of these sentences requires Kelliher to serve twenty-five years in prison before becoming eligible for parole. As a result, because the court ordered Kelliher to complete his first life sentence before beginning his second life sentence, Kelliher must serve fifty years in prison before initially becoming parole eligible at the age of sixty-seven.

¶ 3    On appeal, Kelliher argued that because the trial court found him to be "neither incorrigible nor irredeemable," it violated the Eighth Amendment to the United States Constitution and article I, section 27 of the North Carolina Constitution to sentence him to what he contended was a de facto sentence of life without parole. A unanimous panel of the Court of Appeals agreed that Kelliher's sentence violated the Eighth Amendment. *State v. Kelliher*, 273 N.C. App. 616, 644 (2020). After the Court of Appeals issued its decision, but prior to briefing and oral argument at this Court, the United States Supreme Court decided *Jones v.*

*Mississippi*, another case examining the scope of the Eighth Amendment in the context of juvenile sentencing. 141 S. Ct. 1307 (2021). In addition to arguing that the Court of Appeals erred in concluding that Kelliher's consecutive life with parole sentences implicated the Eighth Amendment, the State now asserts that *Jones* completely undermines Kelliher's federal and state constitutional claims.

¶ 4        After careful review, we hold that it violates both the Eighth Amendment to the United States Constitution and article I, section 27 of the North Carolina Constitution to sentence a juvenile homicide offender who has been determined to be "neither incorrigible nor irredeemable" to life without parole. Furthermore, we conclude that any sentence or combination of sentences which, considered together, requires a juvenile offender to serve more than forty years in prison before becoming eligible for parole is a de facto sentence of life without parole within the meaning of article I, section 27 of the North Carolina Constitution because it deprives the juvenile of a genuine opportunity to demonstrate he or she has been rehabilitated and to establish a meaningful life outside of prison. Thus, Kelliher's sentence, which requires him to serve fifty years in prison before becoming eligible for parole, is a de facto sentence of life without parole under article I, section 27. Because the trial court affirmatively found that Kelliher was "neither incorrigible nor irredeemable," he could not constitutionally receive this sentence. Accordingly, we modify the decision of the Court of Appeals and affirm.

## I.    Background

¶ 5        Like many juveniles who commit criminal offenses, Kelliher experienced a tumultuous childhood. He was physically abused by his father and began using alcohol and marijuana regularly at an early age. He attempted suicide by overdose at age 10. He dropped out of school after ninth grade. By the time he was seventeen, Kelliher was generally "under the influence all day" from substances including ecstasy, acid, psilocybin, cocaine, marijuana, and alcohol. He stole and robbed people to support his drug use.

¶ 6        At some point, Kelliher began to "hang out with a guy named . . . [Joshua] Ballard." The two would regularly "drink and do drugs" together. Over the summer of 2001, the pair discussed robbing Eric Carpenter, who was "known to sell a large amount of drugs including cocaine and marijuana and would have a large amount of money." Ballard told Kelliher they were "going to have to kill Eric Carpenter" after robbing him because Carpenter would know their identities and be able to implicate them in the crime. Their plan was to arrange to purchase drugs from Carpenter behind a local furniture store. Kelliher would drive Ballard to the furniture store; Ballard would approach Carpenter to complete the transaction, shoot him, steal whatever drugs and money he had on his person and in his vehicle, and then flee alongside Kelliher. Kelliher offered to lend Ballard his .38 caliber pistol.

¶ 7        After arranging the drug buy, Ballard and Kelliher drove to the furniture store

in a pickup truck.[1] However, at the furniture store, they encountered a law enforcement officer in a marked vehicle driving around the parking lot. Carpenter pulled his vehicle next to Kelliher's and told Kelliher to follow him to another location. Eventually, Carpenter led Ballard and Kelliher to his apartment, where they were joined by Carpenter's girlfriend, Kelsea Helton, who was "five[ or] six months" pregnant. According to Kelliher's later testimony, at some point Ballard "pulled the weapon" and "got both [Carpenter and Helton] down . . . on their knees facing a wall." As Kelliher continued to "gather[ ]" drugs from around Carpenter's apartment, "he heard two shots, saw two flashes." Kelliher and Ballard fled the apartment and ran back to Kelliher's vehicle. They then spent time using cocaine and marijuana they stole from the apartment and drinking liquor in a park. Carpenter and Helton died of gunshot wounds to the backs of their heads.

**A. Initial trial and resentencing**

¶ 8     Kelliher was arrested two days after the shootings. On 25 March 2002, he was indicted by a Cumberland County Grand Jury for two counts of first-degree murder, two counts of robbery with a dangerous weapon, and one count of conspiracy to commit robbery. On 5 June 2002, the Superior Court, Cumberland County conducted a Rule 24 hearing during which the State averred that it "ha[d] evidence of one or

---

[1] A third person was also present in Kelliher's vehicle, although he did not have "any role" in the crime "other than just literally being a warm body in the back of the truck."

more aggravating factors which would call for the imposition of the death penalty." Before the case came to trial, Kelliher pleaded guilty to all charges; in exchange, the District Attorney "exercise[d] his discretion . . . [to] declare the murder cases to be non-capital."[2] The trial court imposed two consecutive sentences of life without parole for the first-degree murder convictions and term-of-years sentences for the robbery and conspiracy convictions, to be run concurrently. Kelliher did not appeal.[3]

¶ 9        In 2013, Kelliher filed a motion for appropriate relief (MAR) alleging that his sentence was unconstitutional under the Eighth Amendment as interpreted by the United States Supreme Court in *Miller v. Alabama*, 567 U.S. 460 (2012). The trial court denied Kelliher's MAR on the grounds that *Miller* did not apply retroactively. However, this Court later held—consistent with the United States Supreme Court's decision in *Montgomery v. Louisiana*, 577 U.S. 190, 205 (2016)—that *Miller* announced a substantive constitutional rule that was retroactively applicable in state post-conviction proceedings. *See State v. Young*, 369 N.C. 118, 120 (2016). Accordingly, the Court of Appeals issued an order reversing the trial court's denial of

---

[2] One year after Kelliher entered his guilty plea, the United States Supreme Court held the death penalty unconstitutional for juvenile offenders in *Roper v. Simmons*, 543 U.S. 551 (2005).

[3] Ballard was also arrested and faced the same charges as Kelliher. He pleaded not guilty and was tried capitally. At trial, Kelliher testified for the State, and Ballard was convicted of all charges and received two consecutive sentences of life without parole. However, his convictions were overturned on appeal because the trial court failed to properly question and advise Ballard before he waived his right to a conflict-free trial counsel. *State v. Ballard*, 180 N.C. App. 637, 643 (2006). On remand, Ballard was acquitted.

Kelliher's MAR and remanding for resentencing.

¶ 10        On 13 December 2018, Kelliher's resentencing hearing was held in Cumberland County Superior Court. At the hearing, the State sought life without parole or, in the alternative, two consecutive sentences of life with parole. In support of its position, the State presented a summary of the factual basis for Kelliher's convictions and victim impact testimony from Carpenter's and Helton's fathers. Carpenter's father described learning of his son's death after his neighbors brought him to the crime scene. He conveyed his anger at never getting the chance to meet his grandson. Helton's father described cleaning up the apartment after the murders because he "didn't want somebody else cleaning the blood of [his] daughter off the wall." He discussed how painful it was to see the sad expression on his daughter's face when she died. Both parents shared the ongoing pain and trauma they experienced after losing a child; Helton's father noted that while Kelliher could still find ways to enjoy his life, Kelliher's actions denied Helton, Carpenter, and their unborn child that opportunity.

¶ 11        Kelliher requested that he be sentenced to concurrent sentences of life with parole. In support of his position, Kelliher presented testimony from a forensic psychologist who described Kelliher's difficult childhood and history of substance abuse; the director of a prison-based theological seminary who testified that Kelliher had been selected to train as a "field minister[ ];" a prison writing instructor who

described Kelliher's exemplary work as a writing tutor to other inmates; and Kelliher's pastor, who expressed his view that Kelliher was "absolutely" redeemable. Kelliher also submitted records indicating that he had obtained his GED, associate degree, and a paralegal certificate while in prison; had completed Bible correspondence courses, courses in anger management, coping, and alcohol and drug dependence; and was serving as an inmate treatment assistant.

¶ 12    At the conclusion of the hearing, the sentencing court found the following facts with respect to Kelliher's mitigation evidence:

> One, the defendant was under the age of 18 at the time of the offenses.
>
> Two, due to the defendant's young age, the abusive environment in which he was raised, and his ninth grade education he was immature at the time of the offenses.
>
> Three, the defendant had no prior record at the time of the offenses.
>
> Four, the defendant suffered from ADHD at the time of the offenses.
>
> Five, there is substantial evidence that the defendant has benefitted from rehabilitation while in confinement in that the defendant appears to have been a model inmate with the exception of two infractions for possession [of] non-threatening contraband and being in an unauthorized area.
>
> With respect to other mitigating factors and circumstances the Court also finds present are six, at the time of the offenses the defendant was addicted to drugs.
>
> Seven, the defendant voluntarily accepted

responsibility for his criminal conduct, acknowledged wrongdoing in connection with the offenses, and pled guilty as charged.

Eight, the defendant testified truthfully for the State against his co-defendant twice without a plea agreement or promise of sentence consideration.

Nine, the defendant has furthered his education while incarcerated in that he has attempted to improve himself by taking advantage of programs offered by the North Carolina Division of Adult Corrections by applying for acceptance to a program offered by Southeastern Baptist Seminary at Nash Correctional Center being selected as one of 30 inmates to enter the program out of 362 applicants and successfully completing his first year of the program leading to a bachelor[']s degree in pastoral ministry with a minor in counseling.

Ten, the defendant has continued to pursue a course of self-improvement by teaching himself Spanish.

Eleven, during his incarceration the defendant has worked as a janitor, warehouse worker, maintenance, plumbing, welding, peer counselor, and teacher's aide.

Twelve, a risk assessment by Dr. Thomas Harbin, Ph.D., suggests the defendant presents a low risk of future violent offenses and a risk assessment by the North Carolina Division of Adult Corrections found that the defendant has a low risk of danger to the public.

Thirteen, the defendant has a support system in the community as evidenced by the presence of his parents, sister, and other family friends at this hearing.

Based on these findings of fact, the sentencing court concluded that "the mitigating factors and other factors and circumstances present outweigh all the circumstances of the offense" and that "the defendant is neither incorrigible nor irredeemable."

However, the sentencing court also explained that, in its view, "when it comes to murder, there are not bogos. There is no buy one, get one. There is no kill one, get one. There is no[ ] combination of sentences. There is no consolidation of sentences." Therefore, the sentencing court ordered Kelliher to serve two consecutive sentences of life with parole for the two counts of murder he committed.

**B. The Court of Appeals decision**

¶ 13      On appeal, a unanimous Court of Appeals panel reversed and held that imposing two consecutive sentences of life with parole violated Kelliher's Eighth Amendment right to be free from cruel and unusual punishment. *Kelliher*, 273 N.C. App. at 644. The court's decision rested on three main conclusions. First, the Court of Appeals examined four relevant United States Supreme Court precedents—*Roper*, *Graham v. Florida*, 560 U.S. 48 (2010), *Miller*, and *Montgomery*—and concluded that these decisions established the following substantive constitutional rule:

> [J]uvenile homicide offenders who are neither incorrigible nor irreparably corrupt, are—like other juvenile offenders—so distinct in their immaturity, vulnerability, and malleability as to be outside the realm of [life without parole] sentences under the Eighth Amendment.

*Kelliher*, 273 N.C. App. at 632. Because the sentencing court had deemed Kelliher "neither incorrigible nor irredeemable," the Court of Appeals reasoned that he could not be sentenced to life without parole consistent with the requirements of the Eighth Amendment.

¶ 14    Second, the Court of Appeals concluded that "aggregated sentences may give rise to a *de facto* [life without parole] punishment." *Id.* at 638. According to the Court of Appeals, the substantive Eighth Amendment rule the United States Supreme Court articulated in its juvenile homicide cases "turned on the identity of the defendant, *not* on the crimes perpetrated." *Id.* at 639. Addressing cases from other jurisdictions which had refused to recognize aggregate punishments as de facto life without parole sentences, the Court of Appeals found those cases "distinguishable" based on its view that North Carolina's "caselaw and statutes compel the State to consider consecutive sentences as a single punishment." *Id.* at 640. Therefore, the Court of Appeals concluded that Kelliher's two consecutive life with parole sentences should be treated as a single sentence requiring Kelliher to serve fifty years before becoming eligible for parole.

¶ 15    Third, the Court of Appeals concluded that Kelliher's two consecutive life with parole sentences were equivalent to a de facto life without parole sentence and thus implicated the Eighth Amendment. Specifically, the Court of Appeals held that "a sentence that provides no opportunity for release for 50 or more years is cognizable as a de facto [life without parole] sentence." *Id.* at 644. In reaching this conclusion, the Court of Appeals looked to N.C.G.S. § 15A-1340.19, a statute amending North Carolina's juvenile sentencing scheme in the wake of *Miller*, which provides that "[i]f the sole basis for conviction of a count or each count of first degree murder was the

felony murder rule, then the court shall sentence the defendant to life imprisonment with parole." N.C.G.S. § 15A-1340.19B(a)(1) (2021). Although the Court of Appeals acknowledged that Kelliher "has clearly abandoned any assertion that he was convicted under the felony murder rule. But N.C.[G.S.] § 15A-1340.19B(a)(1) nonetheless indicates that our General Assembly has determined parole eligibility at 25 years for multiple offenses sanctionable by life with parole is not so excessive as to run afoul of *Miller*." *Kelliher*, 273 N.C. App. at 643 (citations omitted). In addition, the Court of Appeals noted that a fifty-year sentence would render Kelliher ineligible for release until after "retirement age," depriving him of an "opportunity to directly contribute to society," and that such a sentence "falls at the limit identified by numerous other jurisdictions as constituting an unconstitutional *de facto* [life without parole] sentence." *Id.* at 641–42.

¶ 16         In summary, the Court of Appeals held that

> under Eighth Amendment jurisprudence: (1) *de facto* [life without parole] sentences imposed on juveniles may run afoul of the Eighth Amendment; (2) such punishments may arise out of aggregated sentences; and (3) a sentence that provides no opportunity for release for 50 or more years is cognizable as a *de facto* [life without parole] sentence. Consistent with the Eighth Amendment as interpreted by *Roper*, *Graham*, *Miller*, and *Montgomery*, these holdings compel us to reverse and remand Defendant's sentence.

*Id.* at 644. The Court of Appeals did not separately address Kelliher's argument that his sentence violated article I, section 27 of the North Carolina Constitution. Rather,

citing this Court's decision in *State v. Green*, 348 N.C. 588 (1998), the Court of Appeals stated that its "analysis . . . applies equally to both" Kelliher's federal and state constitutional claims. *Kelliher*, 273 N.C. App. at 633 n. 10.

¶ 17        The State filed a notice of appeal of a constitutional question pursuant to N.C.G.S. § 7A-30(1) and, in the alternative, a petition for discretionary review pursuant to N.C.G.S. § 7A-31. This Court allowed the State's petition for discretionary review and, in addition, Kelliher's conditional petition seeking review of the scope of protection afforded to him under article I, section 27 of the North Carolina Constitution.

## II.    Federal constitutional claim

¶ 18        The Eighth Amendment to the United States Constitution provides in full that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted." U.S. Const. amend. XIII. "[T]he words of the Amendment are not precise, and . . . their scope is not static. The Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 100–101 (1958).

¶ 19        Criminal punishment is cruel and unusual within the meaning of the Eighth Amendment when it is disproportionate. *See, e.g.*, *Montgomery*, 577 U.S. at 206 ("Protection against disproportionate punishment is the central substantive guarantee of the Eighth Amendment and goes far beyond the manner of determining

a defendant's sentence."); *Graham*, 560 U.S. at 59 ("The concept of proportionality is central to the Eighth Amendment."). A punishment can be unconstitutionally disproportionate as applied to a particular offender for a particular offense if it is an "extreme sentence[ ] that [is] 'grossly disproportionate' to the crime." *Harmelin v. Michigan*, 501 U.S. 957, 1001 (Kennedy J., concurring in part) (quoting *Solem v. Helm*, 463 U.S. 277, 288 (1983)). In these cases, a court "considers all of the circumstances of the case to determine whether the sentence is unconstitutionally excessive." *Graham*, 560 U.S. at 59. A punishment can also be disproportionate as applied to all offenders within a particular category based on "the nature of the offense" or "the characteristics of the offender." *Id.* at 60. In these cases, courts utilize a two-step inquiry:

> The Court first considers "objective indicia of society's standards, as expressed in legislative enactments and state practice," to determine whether there is a national consensus against the sentencing practice at issue. *Roper*, [543 U.S.] at 572, 125 S.Ct. 1184. Next, guided by "the standards elaborated by controlling precedents and by the Court's own understanding and interpretation of the Eighth Amendment's text, history, meaning, and purpose," *Kennedy*[ *v. Louisiana*], 554 U.S. [407,] 421 [(2008)], 128 S.Ct., at 2650, the Court must determine in the exercise of its own independent judgment whether the punishment in question violates the Constitution.

*Id.* at 61.

¶ 20    In this case, Kelliher argues that his consecutive life sentences are unconstitutional because he falls within a category of offenders for whom a sentence

of life without parole is always and inevitably disproportionate: juvenile offenders who are "neither incorrigible nor irredeemable." This argument requires Kelliher to establish two necessary corollaries: (1) that the Eighth Amendment flatly prohibits the imposition of a sentence of life without parole for the category of juvenile homicide offenders who are "neither incorrigible nor irredeemable"; and (2) that he has received a sentence which the Eighth Amendment forbids for this category of offenders, e.g., a de facto sentence of life without parole. We conclude that the Eighth Amendment does bar the imposition of life without parole for the category of juvenile homicide offenders who have expressly been found to be "neither incorrigible nor irredeemable" and that consecutive sentences requiring a juvenile offender to serve fifty years before becoming parole eligible are de facto life without parole sentences. Thus, we conclude that Kelliher's consecutive life sentences requiring him to serve fifty years before he becomes eligible for parole violate the Eighth Amendment.[4]

**A. Eighth Amendment principles**

¶ 21     The United States Supreme Court has considered the meaning of the Eighth Amendment in the juvenile sentencing context on numerous occasions over the past two decades. In this case, the Court of Appeals comprehensively examined four relevant Supreme Court precedents: *Roper*, *Graham*, *Miller*, and *Montgomery*.

---

[4] Our resolution of Kelliher's appeal in this case is consistent with this Court's resolution of the defendant's appeal from *State v. Conner*, 275 N.C. App. 758 (2020), also issued today.

Although the parties dispute the applicability of these precedents to Kelliher's particular sentence, as well as their significance in light of the United States Supreme Court's recent decision in *Jones*, the parties do not meaningfully contest the Court of Appeals' characterization of these cases. Accordingly, we will only briefly summarize these four cases to contextualize Kelliher's claims and our subsequent legal analysis.

### 1. Roper, Graham, Miller, Montgomery

In *Roper v. Simmons*, the United States Supreme Court held that it violated the Eighth Amendment to execute juvenile offenders, including those who committed homicide offenses. 543 U.S. at 575. This constitutional rule was rooted in the Supreme Court's assessment of "[t]he differences between juvenile and adult offenders" which bore on the various penological justifications for imposing criminal punishment. *Id.* at 572. The Supreme Court identified "[t]hree general differences between juveniles under 18 and adults [which] demonstrate that juvenile offenders cannot with reliability be classified among the worst offenders" who could be subjected to the death penalty "no matter how heinous the crime." *Id.* at 568–69. These differences were (1) juveniles' "lack of maturity and . . . underdeveloped sense of responsibility," *id.* at 569 (quoting *Johnson v. Texas*, 509 U.S. 350, 367 (1993)); (2) that juveniles were "more vulnerable or susceptible to negative influences and outside pressures, including peer pressure," *id.* (citing *Eddings v. Oklahoma*, 455 U.S.

104, 115 (1982)); and (3) the fact that "the character of a juvenile is not as well formed as that of an adult," meaning "[t]he personality traits of juveniles are more transitory, less fixed," *id.* at 570.

¶ 23     These differences rendered juvenile offenders categorically less morally culpable for their criminal conduct than adults who committed the same criminal acts. *Id.* By extension, the two penological justifications for imposing the death penalty—"retribution and deterrence of capital crimes by prospective offenders"— applied "with lesser force" to juveniles than to adults. *Id.* at 571 (first quoting *Atkins v. Virginia*, 536 U.S. 304, 319 (2002)). According to the Court, "[r]etribution is not proportional if the law's most severe penalty is imposed on one whose culpability or blameworthiness is diminished, to a substantial degree, by reason of youth and immaturity." *Id.* "As for deterrence, it is unclear whether the death penalty has a significant or even measurable deterrent effect on juveniles . . . . [And] the absence of evidence of deterrent effect is of special concern because the same characteristics that render juveniles less culpable than adults suggest as well that juveniles will be less susceptible to deterrence." *Id.* Thus, without looking away from "the brutal crimes too many juvenile offenders have committed," the Supreme Court concluded that "[t]he differences between juvenile and adult offenders are too marked and well understood to risk allowing a youthful person to receive the death penalty despite insufficient culpability." *Id.* at 572–73.

¶ 24          In *Graham v. Florida*, the Supreme Court reaffirmed its "observations in *Roper* about the nature of juveniles" and the "fundamental differences between juvenile and adult minds" in holding that the Eighth Amendment forbid the imposition of life without parole for juvenile non-homicide offenders. 560 U.S. at 68. The Court explained that although a sentence of life without parole was less severe than the death penalty, the sentences "share some characteristics . . . that are shared by no other sentences," including that both "alter[ ] the offender's life by a forfeiture that is irrevocable" and "deprive[ ] the convict of the most basic liberties without giving hope of restoration, except perhaps by executive clemency—the remote possibility of which does not mitigate the harshness of the sentence." *Id.* at 69–70. The Court also noted that life without parole was "an especially harsh punishment for a juvenile" because "[u]nder this sentence a juvenile will on average serve more years and a greater percentage of his life in prison than an adult offender," a "reality [that] cannot be ignored." *Id.* at 70–71. As in *Roper*, the Court examined the "penological justification[s]" for imposing life without parole and concluded that "[w]ith respect to life without parole for juvenile nonhomicide offenders, none of the goals of penal sanctions that have been recognized as legitimate—retribution, deterrence, incapacitation, and rehabilitation—provides an adequate justification" *Id.* at 71 (citations omitted). Accordingly, the Supreme Court held that while states are "not required to guarantee eventual freedom to a juvenile offender convicted of a

nonhomicide crime," states must give juvenile nonhomicide offenders "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Id.* at 75.

¶ 25        Next, in *Miller v. Alabama*, the Supreme Court held "that mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.' " 567 U.S. at 465. In *Miller*, the Supreme Court drew on "two strands of precedent reflecting our concern with proportionate punishment." *Id.* at 470. The first set of precedents, which included *Roper* and *Graham*, "adopted categorical bans on sentencing practices based on mismatches between the culpability of a class of offenders and the severity of a penalty." *Id.* These cases established that "children are constitutionally different from adults for purposes of sentencing." *Id.* at 471. The second set of precedents included cases "demanding individualized sentencing when imposing the death penalty." *Id.* at 475. These cases demonstrated that "in imposing a State's harshest penalties, a sentencer misses too much if he treats every child as an adult" and in the process fails to consider a juvenile offender's "age and the wealth of characteristics and circumstances attendant to it." *Id.* at 476–77. Read together, these two strands of precedent led the Supreme Court to conclude that "the Eighth Amendment forbids a sentencing scheme that mandates life without possibility of parole for juvenile offenders," including juveniles convicted of homicide offenses. *Id.* at 479.

¶ 26        Notably, the Supreme Court refused to "consider [the juvenile offenders']

alternative argument that the Eighth Amendment requires a categorical bar on life

without parole for juveniles, or at least for those 14 and younger." *Id.* Nonetheless,

the Court explained that

> given all we have said in *Roper*, *Graham*, and this decision
> about children's diminished culpability and heightened
> capacity for change, we think appropriate occasions for
> sentencing juveniles to [life without parole] will be
> uncommon. That is especially so because of the great
> difficulty we noted in *Roper* and *Graham* of distinguishing
> at this early age between "the juvenile offender whose
> crime reflects unfortunate yet transient immaturity, and
> the rare juvenile offender whose crime reflects irreparable
> corruption." *Roper*, 543 U.S. at 573, 125 S.Ct. 1183;
> *Graham*, 560 U.S., at 68, 130 S.Ct., at 2026-2027. Although
> we do not foreclose a sentencer's ability to make that
> judgment in homicide cases, we require it to take into
> account how children are different, and how those
> differences counsel against irrevocably sentencing them to
> a lifetime in prison.

*Id.* at 479–80.

¶ 27        Finally, in *Montgomery v. Louisiana*, the Supreme Court confirmed that *Miller*

announced a substantive constitutional rule retroactively applicable in state post-

conviction proceedings. 577 U.S. at 200. The Supreme Court explained that under

*Teague v. Lane*, 489 U.S. 288 (1989), "courts must give retroactive effect to new

watershed procedural rules and to substantive rules of constitutional law."

*Montgomery*, 577 U.S. at 198. The latter category encompassed " 'rules forbidding

criminal punishment of certain primary conduct,' as well as 'rules prohibiting a

certain category of punishment for a class of defendants because of their status or offense.'" *Id.* (quoting *Penry v. Lynaugh*, 392 U.S. 302, 330 (1989)). Substantive rules "set forth categorical constitutional guarantees that place certain criminal laws and punishment altogether beyond the State's power to impose." *Id.* at 201. The Supreme Court held that *Miller* announced the substantive rule that life without parole was forbidden as a "disproportionate sentence" under the Eighth Amendment for every juvenile homicide offender whose crime reflected "transient immaturity" as opposed to "irreparable corruption." *Id.* at 209.

¶ 28      In concluding that *Miller* announced a substantive constitutional rule, *Montgomery* clarified the scope and meaning of *Miller*'s holding. The Supreme Court stated that "[a]lthough *Miller* did not foreclose a sentencer's ability to impose life without parole on a juvenile, [*Miller*] explained that a lifetime in prison is a disproportionate sentence for all but the rarest of children, those whose crimes reflect irreparable corruption." *Id.* at 195 (cleaned up); *see also id.* at 208 ("The [*Miller*] Court recognized that a sentencer might encounter the rare juvenile offender who exhibits such irretrievable depravity that rehabilitation is impossible and life without parole is justified."). The Supreme Court further explained that the existence of a discretionary sentencing scheme did not itself guarantee that a juvenile homicide offender could constitutionally be sentenced to life without parole:

> *Miller*, then, did more than require a sentencer to consider
> a juvenile offender's youth before imposing life without

> parole . . . . Even if a court considers a child's age before
> sentencing him or her to a lifetime in prison, that sentence
> still violates the Eighth Amendment for a child whose
> crime reflects unfortunate yet transient immaturity.
> Because *Miller* determined that sentencing a child to life
> without parole is excessive for all but the rare juvenile
> offender whose crime reflects irreparable corruption, it
> rendered life without parole an unconstitutional penalty
> for a class of defendants because of their status–that is,
> juvenile offenders whose crimes reflect the transient
> immaturity of youth. As a result, *Miller* announced a
> substantive rule of constitutional law.

*Id.* (cleaned up). In reaching this conclusion, the Court expressly rejected the

argument that "*Miller* is procedural because it did not place any punishment beyond

the State's power to impose," holding instead that "*Miller* did bar life without parole

. . . for all but the rarest of juvenile offenders, those whose crimes reflect permanent

incorrigibility." *Id.* at 209.

¶ 29         As summarized in *Montgomery*, the United States Supreme Court decisions

addressing juvenile offenders up until this point "drew a line between children whose

crimes reflect transient immaturity and those rare children whose crimes reflect

irreparable corruption." *Id.* A sentence of "life without parole could be a proportionate

sentence for *the latter kind of juvenile offender*," but not the former. *Id.* (emphasis

added). Sentencing courts would be required to conduct "[a] hearing where youth and

its attendant characteristics are considered as sentencing factors" in order to

"separate those juveniles who may be sentenced to life without parole" (e.g., those

"whose crimes reflect irreparable corruption") "from those who may not" (e.g., those

"whose crimes reflect transient immaturity" and for whom life without parole is "an excessive sentence"). *Id.* at 210 (cleaned up); *see also id.* at 211 ("That *Miller* did not impose a formal factfinding requirement does not leave States free to sentence a child whose crime reflects transient immaturity to life without parole. To the contrary, *Miller* established that this punishment is disproportionate under the Eighth Amendment."). Thus, as the Court of Appeals correctly held in this case, under the precedents before it at the time Kelliher's appeal was decided, the Eighth Amendment prohibited the imposition of a sentence of life without parole on a juvenile who, like Kelliher, was found to be "neither incorrigible nor irredeemable."

### 2. *The impact of* Jones v. Mississippi

Yet our federal constitutional analysis does not end with *Roper*, *Graham*, *Miller*, and *Montgomery*. After the Court of Appeals issued its opinion in this case, the United States Supreme Court decided *Jones v. Mississippi*, another decision examining the Eighth Amendment protections afforded to juvenile homicide offenders. The State argues that even if the Court of Appeals correctly interpreted the United States Supreme Court's earlier juvenile sentencing decisions, *Jones* fundamentally alters the Supreme Court's Eighth Amendment jurisprudence. In the State's view, *Jones* establishes that the Eighth Amendment requires nothing more than the existence of a discretionary sentencing procedure under which the sentencer is allowed to consider a juvenile homicide offender's youth; the State contends that,

after *Jones*, any juvenile homicide offender can be sentenced to life without parole once these procedural prerequisites have been satisfied. In contrast, Kelliher reads *Jones* as a narrow ruling answering a procedural question arising after *Miller* and *Montgomery*: whether a sentencing court must enter a finding that the juvenile is irreparably corrupt before sentencing that juvenile to life without parole. In Kelliher's view, *Jones* solely addressed this question and in no way abrogated the substantive constitutional rule articulated in *Miller* and *Montgomery*.

¶ 31 In *Jones*, a Mississippi trial court sentenced fifteen-year-old Brett Jones to life without parole for first-degree murder. 141 S. Ct. at 1311. The court which sentenced Jones did not enter a finding declaring Jones "permanently incorrigible," nor did the sentencing court "provide an on-the-record sentencing explanation with an implicit finding that the defendant is permanently incorrigible." *Id.* Jones argued that this omission meant his sentence ran afoul of the substantive Eighth Amendment rule articulated in *Miller* and made retroactively applicable in *Montgomery*. *Id.* The United States Supreme Court disagreed.

¶ 32 According to the Supreme Court, *Miller* and *Montgomery* "squarely rejected" the argument that a sentencing court "must also make a separate factual finding of permanent incorrigibility before sentencing a murderer under 18 to life without parole." *Id.* at 1314. Instead, the Supreme Court read *Miller* and *Montgomery* as establishing that "a separate factual finding of permanent incorrigibility is not

required." *Id.* at 1313; *see also id.* at 1318–19 ("The Court has unequivocally stated that a separate factual finding of permanent incorrigibility is not required before a sentencer imposes a life-without-parole sentence on a murderer under 18."). Additionally, the Supreme Court explained that "an on-the-record sentencing explanation is not necessary to ensure that a sentencer considers a defendant's youth" because "if the sentencer has discretion to consider the defendant's youth, the sentencer necessarily will consider the defendant's youth, especially if defense counsel advances an argument based on the defendant's youth." *Id.* at 1319. Therefore, the fact that the sentencing court did not explicitly find Jones to be incorrigible before sentencing him to life without parole did not offend the Eighth Amendment, as the sentencing court possessed the discretion to impose a lesser sentence based on its own consideration of Jones' youth. *Id.*

¶ 33    On its face, aspects of *Jones* could be viewed as conflicting with, and thus implicitly overruling, aspects of *Miller* and *Montgomery*. For example, the Supreme Court in *Jones* stated that "[i]n a case involving an individual who was under 18 when he or she committed a homicide, a State's discretionary sentencing system is both constitutionally necessary and constitutionally sufficient." *Id.* at 1313. As the State argues, this language could be read to suggest that the Eighth Amendment permits courts to sentence *any* juvenile homicide offender to life without parole, as long as the sentencing court does so in an exercise of its discretion having considered the

defendant's youth. If the State were correct, we would agree that Kelliher's Eighth Amendment claim would necessarily fail: it is indisputable that his sentencing court possessed the discretion to sentence Kelliher to a lesser sentence, and the court plainly considered his youth.

¶ 34 This expansive reading of *Jones* is in significant tension with *Miller* and especially *Montgomery*. In the latter case, the Supreme Court explicitly rejected the argument the State contends the Supreme Court adopted in *Jones*, the argument that the Eighth Amendment requires nothing more than that "sentencing courts . . . take children's age into account before condemning them to die in prison." *Montgomery*, 577 at 209. Instead, the *Montgomery* Court concluded that *Miller* "did bar life without parole . . . for all but the rarest of juvenile offenders, those whose crimes reflect permanent incorrigibility." *Id.*; *see also id.* at 208 ("Even if a court considers a child's age before sentencing him or her to a lifetime in prison, that sentence still violates the Eighth Amendment for a child whose crime reflects unfortunate yet transient immaturity." (cleaned up)). Thus, adopting the State's position would require us to read *Jones* as repudiating core Eighth Amendment principles articulated in *Miller* and *Montgomery*.

¶ 35 The problem with the State's proposed interpretation of *Jones* is that it is irreconcilable with the Supreme Court's own characterization of the question it was answering in *Jones*, the narrowness of its holding, and its description of the

relationship between *Jones* and the Supreme Court's prior juvenile sentencing decisions. By its plain terms, *Jones* makes clear that the Supreme Court intended only to reject an effort to append a new procedural requirement to *Miller*'s and *Montgomery*'s substantive constitutional rule; the Court did not intend to retreat from the substantive constitutional rule articulated in those cases.

¶ 36     For example, the *Jones* Court expressly and repeatedly affirmed that its decision was fully consistent with, and in no way abrogated or overturned, *Miller* and *Montgomery*. *See, e.g.*, *Jones,* 141 S. Ct. at 1321 ("The Court's decision today carefully follows both *Miller* and *Montgomery*. . . . Today's decision does not overrule *Miller* or *Montgomery*."); *see also id.* at 1337 (Sotomayor, J., dissenting) ("[S]entencers should hold this Court to its word: *Miller* and *Montgomery* are still good law."). The *Jones* Court characterized its holding as addressing the narrow question of whether to recognize "an *additional* constitutional requirement that the sentencer must make a finding of permanent incorrigibility before sentencing a murderer under 18 to life without parole," a requirement not imposed by the "significant changes wrought by *Miller* and *Montgomery*." *Id.* at 1322 (emphasis added); *see also id.* at 1323 (Thomas, J., concurring in the judgment) ("The Court correctly holds that the Eighth Amendment does not require a finding that a minor be permanently incorrigible as a prerequisite to a sentence of life without parole."). The *Jones* Court explained that its answer to this question was compelled by "what *Miller* and *Montgomery* said—that

is, their explicit language addressing the precise question before us and definitively rejecting any requirement of *a finding* of permanent incorrigibility." *Id.* (emphasis added). These statements do not support the State's argument that *Jones* countermanded previously decided substantive Eighth Amendment doctrine.

¶ 37 Rather, the "explicit language addressing the precise question before" the Supreme Court in *Jones* demonstrates that the Supreme Court's procedural holding in that case did not displace "*Miller's substantive* holding that life without parole is an excessive sentence for children whose crimes reflect transient immaturity." *Montgomery*, 577 U.S. at 210 (emphasis added). Accordingly, we reject the State's argument that *Jones* controls when a juvenile homicide offender who the sentencing court has found to be redeemable is, nevertheless, sentenced to life without parole. Certainly, *Jones* establishes that the Eighth Amendment does not require a sentencing court to find a juvenile homicide offender permanently incorrigible before sentencing that juvenile to life without parole under a discretionary sentencing scheme like North Carolina's. But *Jones* does not alter the substantive Eighth Amendment rule announced in *Miller* and *Montgomery* which forbids a sentencing court from sentencing redeemable juveniles to life without parole. To hold otherwise would require us to read *Jones* far more expansively than the Supreme Court intended, the very sin that *Jones* warns against committing. Instead, *Jones* reflects the Supreme Court's confidence that sentencing courts with the discretion to adjust

juvenile offenders' sentences based on consideration of their youth will exercise that discretion to distinguish between those juveniles who constitutionally can be sentenced to life without parole and those who cannot.

¶ 38     Therefore, consistent with *Miller*, *Montgomery*, and *Jones*, we conclude that the Eighth Amendment categorically prohibits a sentencing court from sentencing any juvenile to life without parole if the sentencing court has found the juvenile to be "neither incorrigible nor irredeemable." Based on the sentencing court's findings in this case, specifically the court's express finding that Kelliher is "neither incorrigible nor irredeemable," Kelliher cannot be sentenced to life without parole consistent with the Eighth Amendment. Having reached this conclusion, we next address whether his aggregate sentences requiring him to spend fifty years in prison before becoming eligible for parole constitute a de facto life without parole sentence within the meaning of the Eighth Amendment.

**B. De facto life without parole is cognizable under the Eighth Amendment**

¶ 39     The Court of Appeals held that Kelliher's sentences comprised a "*de facto* [life without parole] sentence[ ]" which was "cognizable as a cruel and unusual punishment barred under" the Eighth Amendment. *Kelliher*, 273 N.C. App. at 633. As recounted above, the Court of Appeals reasoned that in assessing the scope of protection afforded by the Eighth Amendment, it would consider "the true reality of the actual punishment imposed on a juvenile" rather than how the punishment was

formally denoted. *Id.* at 636. Accordingly, the Court of Appeals held that a sentence constitutes de facto life without parole if it deprives a juvenile offender "of the 'hope for some years of life outside prison walls' required by *Graham* and *Miller*." *Id.* at 641 (quoting *Montgomery*, 577 U.S. at 213). This proposition held true even if the sentence resulted from convictions for multiple offenses (or multiple counts of the same offense), because "[t]he applicability and scope of protection found in the Eighth Amendment under both decisions turned on the identity of the defendant, *not* on the crimes perpetrated." *Id.* at 639. In recognizing the de facto life without parole doctrine, the Court of Appeals joined what it characterized as the "clear majority" of states to have considered this question. *Id.* at 634–35.

¶ 40　　Kelliher urges us to affirm and hold that "the Eighth Amendment applies to juvenile offenders with lengthy sentences, including sentences allowing a possibility of release before death." In his view, the Eighth Amendment requires granting all juvenile offenders except those who have been deemed incorrigible "a meaningful opportunity for release before most of their life has passed by," an opportunity his two consecutive life with parole sentence denies him. By contrast, the State argues that "[a]bsent further guidance from the Supreme Court of the United States," this Court should not recognize sentences other than those formally denoted life without parole as implicating the Eighth Amendment. Regardless, the State contends that even if we were to recognize the de facto life without parole doctrine, Kelliher's

sentence is not akin to de facto life without parole because "[a] sentence that affords a defendant an opportunity for parole even at an older age cannot be said to be its functional equivalent."

¶ 41     The question of whether to recognize lengthy and aggregate sentences as de facto life without parole has not been resolved by the United States Supreme Court and has divided state and federal courts. Nevertheless, our reading of the principles enunciated in the Supreme Court's juvenile sentencing cases persuades us that Kelliher's sentence triggers the substantive constitutional rule set forth in *Miller* and *Montgomery*. We agree with Kelliher and the Court of Appeals that the Eighth Amendment requires courts to afford redeemable juvenile offenders "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Graham*, 560 U.S. at 75.

¶ 42     The crux of *Roper*, *Graham*, *Miller*, and *Montgomery* was the uniqueness of adolescence and the ways youth's distinctive characteristics related to the penological justifications for imposing criminal punishment. The salient circumstances rendering certain punishments constitutionally impermissible in *Miller* and *Montgomery* related to the nature of the offender, not the circumstances of the crime. Put another way, the "underlying rationale" of these cases was "not crime specific." *State v. Null*, 836 N.W. 2d 41, 73 (Iowa 2013). Further, the Supreme Court has not drawn the distinction the State now presses between sentences arising from a single offense and

those arising from multiple offenses, despite having been presented with multiple opportunities to do so. For example, one of the juvenile offenders in *Miller* was convicted of felony murder and aggravated robbery, while the other was convicted of murder in the course of arson; the Supreme Court did not indicate that the substantive constitutional rule it was announcing varied in its applicability as between the two juveniles. *See Miller*, 567 U.S. at 467–69. And, as the Supreme Court of Iowa has noted, "after *Miller*, the Supreme Court in several cases involving aggregate crimes granted certiorari, vacated the sentence, and remanded for consideration in light of *Miller*." *Null*, 836 N.W.2d at 73–74 (collecting cases).

¶ 43        As the Supreme Court has stated, when it comes to the Eighth Amendment, "reality cannot be ignored." *Graham*, 560 U.S. at 71. Therefore, we agree with Kelliher and the Court of Appeals that a sentence of fifty years before parole eligibility is akin to a de facto sentence of life without parole within the meaning of the Eighth Amendment. Allowing a juvenile the opportunity to be released on parole only after spending fifty years in prison "den[ies] the defendant the right to reenter the community" in any meaningful way. *Id.* at 74; *see also People v. Buffer*, 2019 IL 122327, ¶ 33 ("Practically, and ultimately, the prospect of geriatric release does not provide a juvenile with a meaningful opportunity to demonstrate the maturity and rehabilitation required to obtain release and reenter society.").

### III.    State constitutional claim

¶ 44    We separately address Kelliher's claim arising under article I, section 27 of the North Carolina Constitution, which provides in full that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel or unusual punishments inflicted." N.C. Const. art. I, sec. 27. The State argues that article I, section 27 should be interpreted in lockstep with the Eighth Amendment—it contends that the protections afforded by article I, section 27 are coextensive with the Eighth Amendment, such that the United States Supreme Court's interpretation of the Eighth Amendment controls our interpretation of article I, section 27. Kelliher argues that both the text of article I, section 27 as well as unique considerations embodied in other provisions of the North Carolina Constitution should compel us to independently construe the scope of the protections afforded by our state's own constitution in this context.

¶ 45    We agree with Kelliher that article I, section 27 of the North Carolina Constitution offers protections distinct from, and in this context broader than, those provided under the Eighth Amendment. Accordingly, we hold that Kelliher's sentence is unconstitutional under article I, section 27 of the North Carolina Constitution,

regardless of whether or not his sentence violates the Eighth Amendment.[5]

**A. Article I, Section 27 is distinct from the Eighth Amendment**

¶ 46    We first address the State's argument that article I, section 27 must be interpreted in lockstep with the Eighth Amendment. At the outset, we note the textual distinction between article I, section 27, which prohibits punishment that is "cruel *or* unusual," and the Eighth Amendment, which prohibits punishment that is "cruel *and* unusual." Ordinarily, we presume that the words of a statute or constitutional provision mean what they say. *See, e.g.*, *State ex rel. Martin v. Preston*, 325 N.C. 438, 449 (1989) ("In interpreting our Constitution–as in interpreting a statute–where the meaning is clear from the words used, we will not search for a meaning elsewhere."). Thus, it is reasonable to presume that when the Framers of the North Carolina Constitution chose the words "cruel *or* unusual," they intended to prohibit punishment that was *either* cruel *or* unusual, consistent with the ordinary

---

[5] Several state courts have recognized that consecutive sentences imposed on juveniles are subject to *Graham* and *Miller*-type limits under their state constitution's analog to the Eighth Amendment or under their independent power to review sentences. *See, e.g., Brown v. State,* 10 N.E.3d 1, 7–8 (Ind. 2014) (holding that *Miller* and *Graham* applied to 150-year aggregate sentence when acting pursuant to state constitutional authority to review and revise sentences); *State v. Null,* 836 N.W.2d 41, 74–77 (Iowa 2013) (explaining that the "[Constitution of Iowa] requires . . . recogniz[ing] and apply[ing] the core teachings of *Roper, Graham*, and *Miller* in making sentencing decisions for long prison terms involving juveniles . . . [and] consider[ing] whether the imposition of consecutive sentences would result in a prison term of such length that it [is] cruel and unusual punishment[.]"); *Commonwealth v. Perez,* 477 Mass. 677, 686 (2017) (holding that Massachusetts constitution requires *Miller*-hearing before imposing aggregate sentence exceeding the sentence that a juvenile would receive for murder).

meaning of the disjunctive term "or." *See, e.g.*, *Carolina Power & Light Co. v. City of Asheville*, 358 N.C. 512, 519 (2004) (explaining that the proper interpretation of a statute was influenced "by the use of the conjunctive term 'and' within the statute"); *In re Duckett's Claim*, 271 N.C. 430, 437 (1967) ("[T]he disjunctive participle 'or' is used to indicate a clear alternative. The second alternative is not a part of the first, and its provisions cannot be read into the first.").

¶ 47    That article I, section 27 is textually distinct from the Eighth Amendment suggests that the people of North Carolina intended to provide a distinct set of protections in the North Carolina Constitution than those provided to them by the federal constitution. *Cf. People v. Bullock*, 440 Mich. 15, 31 n.11 (1992) ("[I]t seems self-evident that any adjectival phrase in the form 'A *or* B' necessarily encompasses a broader sweep than a phrase in the form 'A *and* B.' The set of punishments which are *either* 'cruel' or 'unusual' would seem necessarily broader than the set of punishments which are *both* 'cruel' and 'unusual.' "); *Commonwealth v. Concepcion*, 487 Mass. 77, 86, *cert. denied sub nom. Concepcion v. Massachusetts*, 142 S. Ct. 408 (2021) (stating that a Massachusetts constitutional provision proscribing cruel or unusual punishment "affords defendants greater protections than the Eighth Amendment does"). At least one Justice of this Court has previously expressed his adherence to this view. *See Medley v. N.C. Dep't of Correction*, 330 N.C. 837, 846 (1992) ("The disjunctive term 'or' in the State Constitution expresses a prohibition on

punishments more inclusive than the Eighth Amendment.") (Martin, J., concurring). Given that our interpretation of the North Carolina Constitution always "begin[s] with the text," *Comm. to Elect Dan Forest v. Emps. Pol. Action Comm.*, 376 N.C. 558, 2021-NCSC-6, ¶ 15, there is reason to confer interpretive significance on this textual distinction, *cf.* William W. Berry III, *Cruel and Unusual Non-Capital Punishments*, 58 Am. Crim. L. Rev. 1627, 1653 (2021) ("In many cases . . . the state constitutional language is different from the Eighth Amendment, and often in significant ways . . . . [T]hese linguistic differences provide the basis for broader, or at least different, coverage of state punishments.").

¶ 48        Further, even where a provision of the North Carolina Constitution precisely mirrors a provision of the United States Constitution, "we have the authority to construe our own constitution differently from the construction by the United States Supreme Court of the Federal Constitution, as long as our citizens are thereby accorded no lesser rights than they are guaranteed by the parallel provision." *State v. Carter*, 322 N.C. 709, 713 (1988); *see also State v. Arrington*, 311 N.C. 633, 642 (1984) ("In construing provisions of the Constitution of North Carolina, this Court is not bound by opinions of the Supreme Court of the United States construing even identical provisions in the Constitution of the United States."). Our independent authority to interpret state constitutional provisions reflects the unique role of state constitutions and state courts within our system of federalism. *See generally* Jeffrey

S. Sutton, *51 Imperfect Solutions: States and the Making of American Constitutional Law* (2018). It also reflects the need to "give our Constitution a liberal interpretation in favor of its citizens with respect to those provisions which were designed to safeguard the liberty and security of the citizens in regard to both person and property." *Corum v. Univ. of N.C. Through Bd. of Governors*, 330 N.C. 761, 783 (1992); *see also* John V. Orth & Paul Martin Newby, *The North Carolina State Constitution* 37 (2d ed. 2013) ("[T]hese provisions [in N.C. Const. art. I] . . . empower the state courts to provide protections going even beyond those secured by the U.S. Constitution.").

Finally, the nature of the inquiry the United States Supreme Court has adopted in resolving cruel and unusual punishment claims itself suggests that state courts should not reflexively defer to United States Supreme Court precedent in assessing similar claims arising under distinct state constitutional provisions. As recounted above, Eighth Amendment doctrine assesses a challenged punishment by reference to practices in other jurisdictions, and ultimately requires a court to "determine in the exercise of its own independent judgment whether the punishment in question violates the [United States] Constitution." *Graham*, 560 U.S. at 61. Thus, even if we were to adhere to the United States Supreme Court's basic analytical framework, we might diverge from the Court in how that framework is applied. Although we have good reason to (and indeed must) defer to the "independent

judgment" of the United States Supreme Court in assessing whether a punishment is cruel and unusual as judged against the standards embodied in the United States Constitution, "[t]his Court is the only entity which can answer with finality questions concerning the proper construction and application of the North Carolina Constitution." *Virmani v. Presbyterian Health Servs. Corp.*, 350 N.C. 449, 474 (1999).

¶ 50        The constitutional text, our precedents illustrating this Court's role in interpreting the North Carolina Constitution, and the nature of the inquiry used to determine whether a punishment violates the federal constitution all militate against interpreting article I, section 27 in lockstep with the Eighth Amendment. In response, the State argues that this question was asked and answered in a previous case, *State v. Green*, 348 N.C. 588 (1998), which the State contends controls here. In *Green*, a case in which a defendant who was convicted of a first-degree sexual offense he committed at age thirteen challenged his sentence of life imprisonment, we noted the textual difference between article I, section 27 and the Eighth Amendment but observed that "this Court historically has analyzed cruel and/or unusual punishment claims by criminal defendants the same under both the federal and state constitutions." *Green*, 348 N.C. at 603. In a footnote, we also explained that we would not at that time adopt Justice Martin's argument regarding the significance of article I, section 27's use of the disjunctive term "or" because "research reveals neither subsequent movement toward [Justice Martin's] position by either this Court or the

Court of Appeals nor any compelling reason to adopt such a position." *Id.* at 603 n.1.

¶ 51        Although these excerpts from *Green* illustrate how this Court approached article I, section 27 at the time that case was decided, the State's argument that *Green* requires us to approach article I, section 27 the same exact way today misses the mark. *Green*'s reasoning is starkly inconsistent with contemporary understandings of adolescence which have been recognized by this Court. For example, in *Green* we reasoned that the defendant's youth did not render his sentence disproportionate in part because

> the number of years a defendant has spent on this planet is not solely determinative of his "age." Due to factors such as life experience, knowledge level, psychological development, criminal familiarity, and sophistication and severity of the crime charged, a criminal defendant may be deemed to possess the wisdom and age of individuals considerably older than his chronological age.

348 N.C. at 610 (citations omitted). Yet, as we recognized in *State v. James*, a juvenile's "chronological age and its hallmark features" undermine the penological justifications for imposing extreme sentences on the vast majority of juveniles. 371 N.C. at 96 (quoting *Miller*, 567 U.S. at 477).[6] In *Green*, we stated that an interest in the "protection of law-abiding citizens from their predators, regardless of the

---

[6] It is notable that the juvenile offender in *Green*, Andre Demetrius Green, "came from a home where his father was an alcoholic and cocaine abuser who provided no support for the family and had little contact with defendant as a child." *State v. Green*, 348 N.C. 588, 593 (1998). Today, these circumstances would certainly be relevant if he were to be resentenced.

predators' ages, is on the ascendancy in our state and nation." 348 N.C. at 608. We now recognize that our practice of describing children as "predators" fundamentally misapprehended the nature of childhood and, frequently, reflected racialized notions of some children's supposedly inherent proclivity to commit crimes. *See The Superpredator Myth, 25 Years Later*, Equal Just. Initiative (Apr. 7, 2014), https://eji.org/news/superpredator-myth-20-years-later/); *see also State v. Null*, 836 N.W.2d 41, 56 (Iowa 2013) (noting that the propagators of the juvenile "predator" theory ultimately acknowledged that "the[ir] predictions did not come to pass, that juvenile crime rates had in fact decreased over the recent decades, that state legislative actions in the 1990s were taken during 'an environment of hysteria featuring highly publicized heinous crimes committed by juvenile offenders,' and that recent scientific evidence and empirical data invalidated the juvenile superpredator myth."); *State v. Belcher*, 342 Conn. 1, 13–14 (2022) ("[A] review of the superpredator theory and its history demonstrates that the theory constituted materially false and unreliable information. . . . Extensive research data and empirical analysis quickly demonstrated that the superpredator theory was baseless."). As *Green* itself recognized, our decision in that case was very much a product of its time. 348 N.C. at 608 ("Similarly, it is the general consensus that serious youthful offenders must be dealt with more severely than has recently been the case in the juvenile system. These tides of thought may ebb in the future, but for now, they predominate in the

arena of ideas."). We conclude today that *Green*'s time has passed; our emerging science-based understanding of childhood development necessitates abandoning its reasoning.[7]

¶ 52      The State's other argument against this Court independently construing article I, section 27 is that our doing so treads upon the prerogatives of the legislature acting on behalf of the people of North Carolina. According to the State, because "[t]he imposition of consecutive life with parole sentences is permissible according to the sentencing scheme enacted by our legislature," and because United States Supreme Court jurisprudence on this matter is unsettled, we should "not be persuaded that the North Carolina Constitution requires a broader approach to juvenile sentencing" than the approach required by the Eighth Amendment. But as we long ago established and have since repeatedly affirmed, the fact that the legislature has enacted a statute does not guarantee its constitutionality as applied in all circumstances; interpreting constitutional provisions is a quintessential judicial function. *See, e.g.*, *Bayard v. Singleton*, 1 N.C. 5 (1787); *McCrory v. Berger*, 368 N.C. 633 (2016). While we always presume that the legislature has acted within

---

[7] To be clear, for the reasons stated above, we do not believe *Green* is binding precedent with respect to the question of how to interpret article I, section 27 in relation to the Eighth Amendment. However, even if it were, we believe the circumstances would justify departing from *Green* in light of that decision's outdated reasoning about adolescence and subsequent decisions disavowing its central holding. *Cf. N. Carolina Farm Bureau Mut. Ins. Co., Inc. v. Dana*, 2021-NCSC-161, ¶ 32 (Earls, J., concurring) (describing the factors to consider when determining if a challenged precedent should be respected under the doctrine of stare decisis).

constitutional bounds, it is this Court's "solemn obligation" to invalidate statutes which violate the North Carolina Constitution, and our authority to do so is "too firmly sanctioned . . . to be questioned." *Stanmire v. Taylor*, 48 N.C. 207, 211 (1855). Ultimately, "[q]uestions concerning the proper construction and application of the North Carolina Constitution can be answered with finality only by this Court." *State v. Jackson*, 348 N.C. 644, 648 (1998).

¶ 53        For these reasons, we conclude that article I, section 27 of the North Carolina Constitution need not be interpreted in lockstep with the Eighth Amendment to the United States Constitution. Although we give "the most serious consideration" to United States Supreme Court decisions and may "in our discretion . . . conclude that the reasoning of such decisions is persuasive," *State v. Jackson*, 348 N.C. 644, 648 (1998), we must strive to give effect to the choices the people of North Carolina made in constructing and adopting North Carolina's own Constitution reflecting North Carolinians' own aspirations and concerns. That includes giving effect to the people of North Carolina's choice to prohibit all punishments that are either cruel *or* unusual. Accordingly, we now turn to the North Carolina Constitution to define the protections afforded by article I, section 27.

**B. State constitutional principles**

¶ 54        Although the two provisions need not be interpreted in lockstep, the Eighth Amendment to the United States Constitution and article I, section 27 of the North

Carolina Constitution do share one important similarity: neither precisely defines the terms "cruel" or "unusual." *See State v. Driver*, 78 N.C. 423, 429 (1878) (explaining that while the North Carolina Constitution does impose "a limit to the power of the [j]udge to punish . . . [w]hat the precise limit is, cannot be prescribed"). What is clear from the plain meaning of both terms is that determining whether a punishment is "cruel" or "unusual" requires a contextual inquiry, the results of which may change over time as society evolves. Thus, we are persuaded that, at this time, there is no reason to depart from the basic Eighth Amendment analytical framework as articulated by the United States Supreme Court in cases like *Trop* and *Graham* and described above. We draw the meaning of article I, section 27 "from the evolving standards of decency that mark the progress of a maturing society," *Trop*, 356 U.S. at 100–01, and we consider "objective indicia of society's standards" when we "exercise [our] own independent judgment [to decide] whether the punishment in question violates the Constitution," *Graham*, 560 U.S. at 61.

¶ 55 However, in exercising our independent judgment to assess a punishment under article I, section 27, we must also consider features unique to the North Carolina Constitution. This includes constitutional provisions appearing in the North Carolina Constitution which have no federal counterpart and which bear on the interpretation of article I, section 27. *See Stephenson v. Bartlett*, 355 N.C. 354, 378 (2002) ("[A]ll constitutional provisions must be read *in pari materia*."). Therefore, our

interpretation of article I, section 27 is informed by other provisions of the North Carolina Constitution addressing the purposes of criminal punishment and the rights of North Carolina's juveniles. We conclude that in light of provisions of the North Carolina Constitution not found in the United States Constitution, sentencing a juvenile who is neither incorrigible nor irredeemable to life without parole is cruel within the meaning of article I, section 27.

¶ 56        First, sentencing a juvenile who can be rehabilitated to life without parole is cruel because it allows retribution to completely override the rehabilitative function of criminal punishment. Although the United States Supreme Court also relied on its account of the penological justifications for punishment in holding certain sentences unconstitutional as applied to juveniles, the North Carolina Constitution is unique in expressly providing that "[t]he object of punishments" in North Carolina are "not only to satisfy justice, *but also to reform the offender* and thus prevent crime . . . ." N.C. Const. Art. XI, § 2 (emphasis added). A punishment which consigns an offender to spend his or her entire life in prison is plainly unconcerned with "reform[ing] the offender." In the context of an adult defendant, such a punishment can typically be justified—either because the nature of the defendant's crimes means "justice" requires such a harsh sentence, or because the State has concluded that adults who commit certain of the most egregious criminal offenses cannot possibly be "reform[ed]."

¶ 57    However, with "exceedingly rare" exceptions, that logic does not hold when dealing with juvenile offenders. *James*, 371 N.C. at 97. Because juveniles have less than fully developed cognitive, social, and emotional skills, they have lessened moral culpability for their actions as compared to adults. *Id.* at 96. Because juveniles are inherently malleable, they have a greater chance of being rehabilitated as compared to adults. Further, juveniles who become involved in the criminal justice system are disproportionately likely to have experienced various childhood traumas, such as Adverse Childhood Experiences (ACEs), which demonstrably impair their cognitive processing and may be expressed, as ably summarized in an amicus brief by Disability Rights North Carolina, "by the early onset of risk behaviors, dysregulation of biological stress systems, alterations in brain anatomy and function, suppression of the immune system, and potential alterations in the child's epigenome." Sentencing the vast majority of juvenile offenders to spend their lives in prison is unjustifiable given the "object of punishments" as defined by article XI, section 2. Given juveniles' diminished moral culpability, it is unjustifiably retributive; given juveniles' heightened capacity for change, it unjustifiably disavows the goal of reform. Punishment which does not correspond to the penological functions enumerated in North Carolina's Constitution is cruel.

¶ 58    Second, sentencing a juvenile who can be rehabilitated to life without parole is cruel because it ignores North Carolina's constitutionally expressed commitment to

nurturing the potential of all our state's children. This commitment is enumerated in two different provisions of our constitution: article I, section 15, which states that "[t]he people have a right to the privilege of education, and it is the duty of the State to guard and maintain that right," and article IX, section 1, which states that "[r]eligion, morality, and knowledge being necessary to good government and the happiness of mankind, schools, libraries, and the means of education shall forever be encouraged." Our constitution's recognition that "[t]he promotion of education generally, and educational opportunity in particular, is of paramount public importance to our state" reflects the understanding that "our collective citizenry" benefits when all children are given the chance to realize their potential. *Hart v. State*, 368 N.C. 122, 138 (2015). Of course, a child who commits a homicide will, justifiably, be denied many life opportunities afforded to other children. But even the child who commits a homicide can, with "exceedingly rare" exceptions, eventually hope to acquire the knowledge, skills, and self-awareness needed to develop into a different kind of person, someone who can make a positive contribution to "our collective citizenry." In light of our constitutional commitment to helping all children realize their potential and our recognition of the interest of all North Carolinians in so doing, it is cruel to sentence a juvenile who has the potential to be rehabilitated to a sentence which deprives him or her of a meaningful opportunity to reenter society and contribute to this state.

¶ 59        To summarize, we hold that sentencing a juvenile who can be rehabilitated to life without parole is cruel within the meaning of article I, section 27 of the North Carolina Constitution. Our conclusion that juvenile life without parole is cruel is bolstered by the recognition that "the United States is the only country in the world that imposes juvenile life without parole sentences; such sentences are banned in every other country and prohibited by human rights treaties." Ben Finholt et. al, *Juvenile Life Without Parole in North Carolina*, 110 J. Crim. L. & Criminology 141, 143 (2020). It is also bolstered by empirical data demonstrating that an individual juvenile offender's chances of receiving a sentence of life without parole may be at least partially attributable to factors that are not salient in assessing the penological appropriateness of a sentence, such as race, socioeconomic status, and geography. *See, e.g.*, *id.* at 163 (describing results of regression analysis showing that juvenile life without parole sentences "are more likely . . . in North Carolina counties with a black population that is above average (20.9%) and in counties where the poverty rate is below average (16.1%)"). In addition, based on the science of adolescent brain development that this Court has previously recognized and our constitutional commitments to rehabilitating criminal offenders and nurturing the potential of all of North Carolina's children, we also conclude that juvenile offenders are presumed to have the capacity to change. "[L]ife without parole sentences for juveniles should be exceedingly rare and reserved for specifically described individuals," that is, those

who cannot be rehabilitated. *James*, 371 N.C. at 96–97. Thus, unless the trial court expressly finds that a juvenile homicide offender is one of those "exceedingly rare" juveniles who cannot be rehabilitated, he or she cannot be sentenced to life without parole.

**C. De facto life without parole is cognizable under Article I, Section 27**

¶ 60     In this case, because the trial court found that he was "neither incorrigible nor irredeemable," Kelliher cannot be sentenced to life without parole consistent with article I, section 27 of the North Carolina Constitution. But Kelliher was not technically sentenced to life without parole; he was given two consecutive sentences of life with parole, each requiring him to serve twenty-five years in prison before becoming eligible for parole. Furthermore, Kelliher did not raise an as-applied claim asserting that his sentence was constitutionally disproportionate based on the particular circumstances of his case. Rather, Kelliher has argued that it is facially unconstitutional under article I, section 27 to sentence any juvenile who can be rehabilitated to life without parole, and that he is among the class of juveniles for whom such a sentence is forbidden. Thus, to prevail on his state constitutional claim, Kelliher must also establish that his sentence of a term of fifty years in prison before becoming eligible for parole is a de facto sentence of life without parole—otherwise, he has not received a sentence which, under his own theory, violates article I, section 27.

¶ 61         Our recognition that article I, section 27 prohibits the imposition of a sentence of life without parole for almost all juvenile offenders is rooted in the insight that juvenile offenders are different from adult criminal defendants in ways that are significant with respect to extreme sentences. What makes the juvenile offender different is the fact that he or she is a child, not the nature or number of the crimes he or she has committed. Indeed, the fact that the juvenile committed multiple crimes (as opposed to a single offense) itself likely reflects distinctive features of youth. A child who commits multiple criminal offenses is no less a child than a child who commits a single criminal offense or a child who commits none. *Cf. State v. Moore,* 76 N.E.3d 1127, 1142 (Ohio 2016) ("Whether the sentence is the product of a discrete offense or multiple offenses, the fact remains that it was a *juvenile* who committed the one offense or several offenses and who has diminished moral culpability."). The protections afforded by article I, section 27 that are applicable to Kelliher emanate from his status as within a category of offenders understood to have diminished moral culpability. The fact that he committed multiple offenses does not change the fact that he was, at the time he committed those offenses, a child understood to be less morally culpable for his actions than an adult. These distinctive features of youth compel us to recognize that a sentence which deprives a juvenile of any genuine opportunity to earn his or her release by demonstrating that he or she has been rehabilitated is, in effect if not in name, a sentence of life without parole within the

meaning of article I, section 27.

¶ 62        A genuine opportunity requires both some meaningful amount of time to demonstrate maturity while the juvenile offender is incarcerated and some meaningful amount of time to establish a life outside of prison should he or she be released. As the Court of Appeals correctly noted, "[s]everal courts have held *de facto* [life without parole] sentences that do not conclusively extend beyond the juvenile's natural life are nonetheless unconstitutional sentences, and many of them have found such sentences to exist when release (either through completion of the sentence or opportunity for parole) is only available after roughly 50 years, and sometimes less." *Kelliher*, 273 N.C. App. at 641 (collecting cases); *see also Carter v. State*, 461 Md. 295, 352 (2018) ("Many courts have concluded that a sentence of a term of years that precludes parole consideration for a half century or more is equivalent to a sentence of life without parole."). Indeed, a clear majority of jurisdictions to consider this issue recognize de facto life without parole sentences as cognizable under the Eighth Amendment or independent state constitutional provisions which therefore may warrant relief under *Graham* and *Miller* or similar state-law principles. *See Kelliher,* 273 N.C. App. at 641; *see also State v. Haag*, 198 Wash. 2d 309, 327 (2021) (concluding that a 46-year sentence is de facto life without parole because it deprives a juvenile offender of a meaningful opportunity to reenter society and have a meaningful life); *State ex. rel Carr v. Wallace,* 527 S.W.3d 55, 63–64 (Mo. 2017) (concluding that

mandatory concurrent sentences with parole eligibility after 50 years constituted a de facto life without parole sentence subject to *Miller*'s sentencing requirements); *Bear Cloud v. State,* 334 P.3d 132, 141-42 (Wy. 2014) (concluding that consecutive sentences, including a life sentence for homicide, providing parole eligibility after 45 years was de facto life without parole sentenced controlled by *Miller*); *Casiano v. Comm'r of Corr.,* 115 A.3d 1031, 1047–48 (Conn. 2015) (concluding that a juvenile's 50 year sentence before parole eligibility was a de facto life without parole sentence controlled by *Miller*). We agree with the Court of Appeals that a sentence of fifty years before being eligible to be considered for parole denies a meaningful opportunity for release for several reasons.

¶ 63        First, a fifty-year sentence means there is a distinct possibility that a juvenile offender will not live long enough to have the opportunity to demonstrate that he has been rehabilitated. Notably, the United States Sentencing Commission has defined "a sentence length of 470 months or longer," or 39 years and two months, as a de facto life sentence because this sentence is "consistent with the average life expectancy of federal criminal offenders." United States Sentencing Commission, *Life Sentences in the Federal System* (February 2015), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/miscellaneous/20150226_Life_Sentences.pdf.

¶ 64        Moreover, juvenile offenders like Kelliher are distinct from the average person

of equivalent age. They are both disproportionately likely to have experienced multiple and often severe childhood traumas, and they will spend the vast majority of their lives within the walls of a prison. Both of these circumstances can significantly reduce an individual's life expectancy. *See* Naja H. Rod, et al, *Trajectories of childhood adversity and mortality in early adulthood: a population-based cohort study.* 396 (No. 10249) Lancet, 489–97 (2020) (finding that children who experience multiple adverse experiences "had a 4.54 times higher all-cause mortality risk . . . than that of children with a low adversity trajectory" with the most common causes of death being "accidents, suicides, and cancer"); *see also Michigan Life Expectancy Data for Youth Serving Natural Life Sentences* 2 (finding that the average life expectancy for juveniles who received natural life sentences was 50.6 years), http://www.lb7.uscourts.gov/documents/17-12441.pdf. Thus, in general, sentencing a juvenile offender to fifty years in prison means he or she will die in prison before ever having the chance to go before the Parole Commission.

¶ 65    Second, a fifty-year sentence means that even if the juvenile offender is released from prison, he or she will have little chance of reintegrating into society in any meaningful way. Having spent at least five decades in prison, a juvenile offender released on parole will face overwhelming challenges when attempting to obtain employment, secure housing, and establish ties with family members or the broader community. *See, e.g.*, Kelly Elizabeth Orians, *"I'll Say I'm Home, I Won't Say I'm*

*Free": Persistent Barriers to Housing, Employment, and Financial Security for Formerly Incarcerated People in Low Income Communities of Color*, 25 Nat'l Black L. J. 23, 25–26 (2016) ("[R]esearch has also found dramatic unemployment rates amongst formerly incarcerated people, in some cases as high as 77 percent after the first year of release."). Juveniles who enter prison at a young age and exit decades later will need to navigate all the difficulties inherent in reentry after being incarcerated, in the context of a dramatically different society than the one they remember. *Cf. People v. Contreras*, 4 Cal. 5th 349, 368 (2018) (requiring juvenile to serve fifty years before parole eligible does not provide "sufficient period to achieve reintegration as a productive and respected member of the citizenry"). Given these difficulties—and the diminished life expectancy of a juvenile offender who has spent five decades in prison—a fifty-year sentence deprives juvenile offenders of any real chance of establishing an independent life upon reentering society.

Having determined that fifty years is a de facto life without parole sentence, we are still faced with the question of how long is too long. We acknowledge that fixing the boundary between a lengthy but constitutionally permissible sentence and an unconstitutional de facto life without parole sentence necessarily requires an exercise of judgment. But it is the role of this Court to "give[ ] specific content" to state constitutional provisions. Orth & Newby at 37. We conclude that in light of the requirements of article I, section 27 and the practical realities as experienced by

juvenile offenders recounted above, any sentence or sentences which, individually or collectively, require a juvenile to serve more than forty years in prison before becoming eligible for parole is a de facto sentence of life without parole within the meaning of article I, section 27.

¶ 67    The Court of Appeals held that any sentence or combination of sentences exceeding twenty-five years before parole eligibility constituted a de facto sentence of life without parole. *Kelliher*, 273 N.C. App. at 643. In reaching this conclusion, the Court of Appeals relied principally on the fact that, following *Miller*, the General Assembly established that a juvenile who is convicted of first-degree murder "shall serve a minimum of 25 years imprisonment prior to becoming eligible for parole." *Id.* (citing N.C.G.S. § 15A-1340.19A). Although other state courts have looked to their own *Miller*-fix statutes in defining what constitutes a sentence of de facto life without parole, *see e.g.*, *People v. Buffer*, 2019 IL 122327, ¶ 40, 137 N.E.3d 763, 774, we cannot do so here because the North Carolina statute is silent on how to sentence multiple counts of premeditated murder.[8]

¶ 68    Instead, we acknowledge that the General Assembly's silence on this question

___

[8] Other states have found legislative indications of what sentence would provide a meaningful opportunity to obtain release in state statutes that provide for parole eligibility at age sixty even when a defendant is sentenced to life without parole. *See Carter v. State*, 461 Md. 295, 356 (2018) ("In considering any of these benchmarks, we must also keep in mind that the Supreme Court has equated the 'meaningful opportunity for release based on demonstrated maturity and rehabilitation' with a 'hope for some years of life outside prison walls.'") (citing *Montgomery v. Louisiana*, 577 U.S. 190, 213 (2016)).

leaves it as a matter of constitutional interpretation. The fact that the legislature has not spoken cannot relieve us of the obligation to interpret and apply the state constitution's guarantee of protection from cruel or unusual punishment in the context of all the other state constitutional provisions that have relevance here. We identify forty years as the threshold distinguishing a permissible sentence from an impermissible *de facto* life without parole sentence for juveniles not found to be irredeemable, based upon our understanding of the minimum amount of time necessary to assure most juvenile offenders are afforded a genuine opportunity to demonstrate they have been rehabilitated and, if released, to establish a meaningful life outside prison walls.

¶ 69        We reach this conclusion for several reasons. First, a maximum of forty years of pre-parole eligibility strikes a balance between two competing—though not equally weighty—interests: our interest in respecting the legislature's choice to afford trial courts the discretion to run multiple sentences either concurrently or consecutively, *see* N.C.G.S. § 15A-1354(a), and our obligation to enforce the constitutional prohibition on "cruel or unusual punishment." N.C. Const. art. I, § 27; *see State v. Conner*, 2022-NCSC-79, ¶ 61. A maximum of forty years before parole eligibility still allows trial courts to sentence juvenile offenders to multiple consecutive sentences if they have committed multiple crimes (up to 40 years in prison before parole eligibility), while also accounting for the hallmark differences between children and

adults noted above that dilute the penological justifications for imposing extreme punishments on juvenile offenders.

¶ 70 A forty-year maximum term before parole eligibility also supports the rehabilitative goal of criminal punishment. We agree with the United States Supreme Court that for rehabilitation to occur, juvenile offenders "must be given the opportunity to show their crime did not reflect irreparable corruptions; and, if it did not, their hope for some years of life outside prison walls must be restored." *Montgomery*, 577 U.S. at 213. It is cruel to sentence a juvenile who has the potential to be rehabilitated to a sentence which deprives him or her of a meaningful opportunity to reenter society and contribute to our state. *Cf. Naovarath v. State*, 105 Nev. 525, 526 (1989) ("All but the deadliest and most unsalvageable of prisoners have the right to appear before the board of parole to try and show that they have behaved well in prison confines and that their moral and spiritual betterment merits consideration of some adjustment of their sentences. Denial of this vital opportunity means denial of hope; it means that good behavior and character improvement are immaterial; it means that whatever the future might hold in store for the mind and spirit of [a juvenile offender] he will remain in prison for the rest of his days."). Establishing a constitutional maximum of 40 years of before parole eligibility ensures that juvenile offenders will indeed have a realistic hope of a meaningful opportunity for reentry.

¶ 71          As an initial matter, life expectancy data suggests that a forty-year pre-parole eligibility maximum will provide juvenile offenders with a realistic hope of meaningful years of life outside prison walls. Because the oldest offenders considered juveniles are seventeen years old, a forty-year term would mean that a juvenile offender will—at latest—be initially eligible for parole beginning at the age of fifty-seven. Although statistics indicate that nearly all fifty-seven-year-olds have more years behind them than in front of them, the opportunity for parole at age fifty-seven nevertheless adequately ensures that such offenders may hold a realistic "hope for some years of life outside prison walls." This demarcation aligns with data from the U.S. Sentencing Commission noted above, which defines a sentence of at least 39 years and two months as a de facto life sentence.

¶ 72          Notably, ensuring that juvenile offenders maintain a realistic hope of some meaningful years of life outside of prison encourages personal development and pro-social behaviors during incarceration, such as furthering one's education, gaining technical or professional skills, and maintaining bonds with friends and loved ones. *Cf. Contreras*, 4 Cal. 5th at 368 ("[A] juvenile offender's prospect of rehabilitation is not simply a matter of outgrowing the transient qualities of youth; it also depends on the incentives and opportunities available to the juvenile going forward."). This stands in stark contrast to a rule that would base the constitutional line solely upon life expectancy, which would functionally—and cruelly—seek to extract the

maximum amount of punishment out of juvenile offenders before releasing them sometime shortly before their expected death. *See Graham*, 560 U.S. at 79 ("A young person who knows that he or she has no chance to leave prison before life's end has little incentive to become a responsible individual."); *see also* Wayne A. Logan, *Proportionality and Punishment: Imposing Life Without Parole on Juveniles*, 33 Wake Forest L. Rev. 681, 712–714 (1998) (describing the "hopelessness and despair" experienced by juvenile offenders serving life sentences who additionally face "far greater risk of physical—and sexual—assault by older, more mature offenders"). Such a rule would thwart rather than further the rehabilitative function of punishment.

Employment data likewise supports this constitutional limit. In addition to "life, liberty, . . . and the pursuit of happiness," our state Constitution enshrines all people with another fundamental right: "the enjoyment of the fruits of their own labor." N.C. Const. Art. I, § 1. This constitutional provision, "although perhaps aimed originally at slavery," has provided the basis for constitutional challenges against undue restraints on employment. Orth & Newby at 46; *see also State v. Harris,* 216 N.C. 746, 759 (1940) (a law that destroys the opportunity to make a living is "a legal grotesquery"). Although they will face significant barriers, juvenile offenders who have the opportunity for parole eligibility after forty years nevertheless may maintain a realistic hope that they may be able to engage in gainful employment (and enjoy its subsequent fruits) upon release from incarceration, as two existing employment legal

frameworks—social security and state retirement benefits—illustrate.

¶ 74        In the social security administrative context, "medical-vocational guidelines, commonly referred to as 'grids,' distill and consolidate long-standing medical evaluation policies employed in disability determinations." *Henderson v. North Carolina Dep't of Human Resources, Div. of Social Services*, 91 N.C. App. 527, 534 (1988). These grids "identify job requirements, interrelate a claimant's physical ability with his age, education, and previous work experience, and direct a conclusion whether work exists that the claimant could perform." *Id.*; *see, e.g., Barnhart v. Thomas*, 540 U.S. 20, 23 – 24 (2003) (summarizing the Social Security Administration's disability determination process); *Harvey v. Heckler*, 814 F.2d 162, 164 (4th Cir. 1987) (same).

¶ 75        While social security eligibility determinations are inherently fact-specific, the grids and their accompanying guidelines provide useful context regarding the impact of age, education, and work experience on employment prospects. For instance, "[a]dvanced age [(55 and over)] and a history of unskilled work or no work experience would ordinarily offset any vocational advantages that might accrue by reason of any remote past education, whether it is more or less than limited education." CFR Appendix 2 to Subpart P of Part 404 – Medical-Vocational Guidelines, § 200.00(d) (https://www.ssa.gov/OP_Home/cfr20/404/404-app-p02.htm). By contrast, "[t]he presence of acquired skills that are readily transferable to a significant range of

skilled work within an individual's residual functional capacity would ordinarily warrant a finding of ability to engage in substantial gainful activity regardless of the adversity of age, or whether the individual's formal education is commensurate with his or her demonstrated skill level." *Id.* at § 200.00(e). Generally, a person of advanced age, who is limited to sedentary work, with limited or less education, and unskilled or no work experience, is deemed disabled and without employment prospects. *Id.* at § 201.01.

¶ 76    In the context of juvenile sentencing, these guidelines support establishing a forty-year maximum term before parole eligibility for juvenile offenders. First, the physical and mental impacts of a decades-long period of incarceration could reasonably be considered a disabling condition, or at least a significant barrier to future employment. Next, juvenile offenders are unlikely to have access to robust advanced educational opportunities while incarcerated. Likewise, juvenile offenders are unlikely to have access to many skilled labor opportunities while incarcerated. As such, the social security guidelines suggest that the closer a juvenile offender gets to "advanced age," the less likely he is to be able to find gainful employment upon release. However, the guidelines suggest that with the benefit of some education and work experience while incarcerated, juvenile offenders with the opportunity for parole after forty years may nevertheless maintain a realistic hope that they will be able to find meaningful employment upon their reentry into society.

¶ 77        The employment rationale is further supported by a second existing legal framework: North Carolina state retirement eligibility. As the Court of Appeals noted, other states have also looked at retirement age in assessing whether a sentence for a redeemable juvenile is a *de facto* life without parole sentence. *Kelliher,* 273 N.C. App. at 641. Under North Carolina law, a person may retire with unreduced retirement benefits after 30 years of creditable work with the state at any age, after 25 years of creditable work at age 60, and, most importantly, after five years of creditable work with the state at age 65. *See* N.C.G.S. § 135-5(b21)(2)(a). Accordingly, under our state retirement system, the minimum career recognized by law to entitle one to retirement with benefits is five years of employment at age 65. In general, across all sectors, the average retirement age in North Carolina is 63. *See* Average Retirement Age by State, https://worldpopulationreview.com/state-rankings/average-retirement-income-by-state.

¶ 78        As this data illustrates, a sentence consigning a juvenile to prison after age 60 will prevent that juvenile from completing what the people of our state consider to be a minimal career of service in time to also retire at age 65. If a meaningful opportunity for life after release must provide for "hope" and a chance for "fulfillment outside prison walls," "reconciliation with society," and "the opportunity to achieve maturity of judgment and self-recognition of human worth and potential," *Graham*, 560 U.S. at 79, then providing some opportunity for a non-incorrigible juvenile offender to seek

to work for a living upon release is necessary. Our constitution, statutes, and demographic data demonstrate that a sentence deprives a person of a meaningful opportunity to work if they are not eligible for parole before they turn sixty years old. Recognizing that an individual released from custody after having spent their entire adult life in prison will need some time to acquire a job, juveniles sentenced to more than 40 years' incarceration will not have a meaningful opportunity to work as that is understood under North Carolina law.

¶ 79    To be clear, our interpretation of what constitutes cruel or unusual punishment as applied to a juvenile offender does not extend to the context of adult offenders. Our decision to recognize the de facto life without parole doctrine in this case does not disturb our previous statements addressing sentences imposed on adult criminal defendants that "[t]he imposition of consecutive life sentences, standing alone, does not constitute cruel or unusual punishment" and that "[a] defendant may be convicted of and sentenced for each specific criminal act which he commits." *State v. Ysaguire*, 309 N.C. 780, 786 (1983). As we have explained, it is the unique characteristics of youth—and the specific ways those unique characteristics relate to the penological justifications for imposing punishment—that render consecutive life sentences cruel as applied to juvenile offenders. A child who commits multiple offenses is still a child, and the constitutionally salient features of youth with respect to sentencing cannot be disregarded.

¶ 80      Further, our recognition of the de facto life without parole doctrine does not dispossess the trial court or other decisionmakers in the criminal justice system of their discretion to weigh the circumstances surrounding a juvenile offender's conduct, including the number of offenses committed, in deciding that juvenile's ultimate fate. These circumstances are likely to be relevant in the district attorney's initial charging decision, in the jury's deliberations, in the sentencing court's initial determination of whether the juvenile can be rehabilitated, in the Parole Commission's disposition of an offender's request for release, and in the Governor's decision to grant or deny a clemency petition. "[T]he fact that the defendants were convicted of multiple crimes may well be relevant in the analysis of individual culpability" when assessing whether or not a juvenile homicide offender is one of the rare juveniles who cannot be rehabilitated, *Null*, 836 N.W.2d at 73, but the fact that a juvenile offender was convicted of multiple crimes is not, on its own, sufficient to consign that juvenile to life in prison from the outset.

¶ 81      Finally, it bears repeating that an opportunity for consideration for parole is no guarantee that parole will ever be granted. Instead, a decision regarding whether a juvenile offender serving a life sentence will be released will be made based on the factors and circumstances present at the most relevant time. Recognizing that our state constitution's prohibition of cruel or unusual sentences applies to de facto life without parole sentences merely provides that consideration of the possibility of

parole can be made at a time when the non-incorrigible offender has a meaningful opportunity to work and contribute to society.

¶ 82      Ultimately, the forty-year threshold reflects our assessment of the various relevant constitutional and penological considerations in view of the best available data regarding the general life expectancy of juveniles sentenced to extremely lengthy prison sentences, including the United States Sentencing Commission report.[9] As noted above, determining the boundary between a lengthy but constitutionally permissible sentence and an unconstitutional de facto life without parole sentence necessarily requires an exercise of judgment. Although none of the data or other legal frameworks detailed above are determinative, these sources of information—in tandem with broader considerations of penological interests, modern understandings of juvenile development, and the evolving standards of decency that mark the

---

[9] Attempting to use more individualized life-expectancy data based on gender and race to assess what sentence might be constitutional for a particular juvenile could raise significant practical and constitutional concerns. Therefore, we decline to do so. *See* Adele Cummings & Stacie Nelson Colling*, There is No Meaningful Opportunity in Meaningless Data: Why It Is Unconstitutional to Use Life Expectancy Tables in Post-Graham* Sentences, 18 U.C. Davis J. Juvenile L. & Policy 267, 282  (2014) (explaining that life expectancy is affected by many "variables that have long been studied by social scientists but are not included in U.S. Census or vital statistics reports—income, education, region, type of community, access to regular health care, and the like . . . .")  In 2020, for example, the life expectancy gap between non-Hispanic whites and non-Hispanic blacks was 5.8 years; the gap between men and women was 5.7 years. Center for Disease Control, Vital Statistics Rapid Release, Number 015 (July 2021), https://www.cdc.gov/nchs/data/vsrr/vsrr015-508.pdf. Sentences based on race and gender differences could raise equal protection problems. *See United States v. Mathurin*, 868 F.3d 921, 932 (11th Cir. 2017) (explaining problems with using mortality tables in this context).

progress of a maturing society— usefully inform our application of the constitutional protections at issue here.

## IV.     Conclusion

The crimes Kelliher committed and the pain he caused are irrevocable. He can never replace what he took from Carpenter, Helton, their friends and families, and the entire community of this state. He will spend decades of his life, and perhaps the remainder of his life, in prison for his actions. But article I, section 27 of the North Carolina Constitution does not permit us to ignore his potential for change. He cannot be deprived the opportunity to demonstrate that he has become someone different than the person he was when he was seventeen years old and at his worst. For the foregoing reasons, and based specifically on our analysis of the independent protections afforded by article I, section 27 of the North Carolina Constitution, the judgment of the Court of Appeals is modified and affirmed. Although we would ordinarily leave resentencing to the trial court's discretion, we agree with the Court of Appeals that "of the two binary options available—consecutive or concurrent sentences of life with parole—one is unconstitutional." *Kelliher*, 273 N.C. App. at 644. Accordingly, we remand to the trial court with instructions to enter two concurrent sentences of life with parole.

MODIFIED AND AFFIRMED.

Chief Justice NEWBY dissenting.

Judicial activism is "[a] philosophy of judicial decision-making whereby judges allow their personal views about public policy, among other factors, to guide their decisions, usu[ally] with the suggestion that adherents of this philosophy tend to find constitutional violations and are willing to ignore governing texts and precedents." *Judicial activism*, *Black's Law Dictionary* (11th ed. 2019). It is difficult to imagine a more appropriate description of the action that the majority takes today.

What range of punishment is appropriate for someone who participates in the brutal execution of multiple people? What branch of government is designed to enact criminal justice policy? Today this Court, in a blatant stroke of judicial activism, decides that it will legislate criminal justice policy. It determines the maximum sentence for a seventeen-year-old who killed multiple people is the same as if he had killed only one. It boldly declares that any harsher penalty is unconstitutionally "cruel." The majority legislates this sentence not through judicial review but by its own determination of "evolving societal standards" and its desire to bring North Carolina in line with its view of international law and what some other states have done. In doing so, the majority casually disregards decades of our precedents and ignores the plain language of various constitutional provisions.

The majority's holding today sets dangerous criminal policy. It devalues human life by artificially capping sentences for offenders who commit multiple

murders. Its decision feeds the growing trend of gangs using younger members to do their killings as they recognize the leniency of criminal sentencing of minors. Further, this decision removes any incentive to limit the murder of witnesses at the crime scene.

¶ 87        During this time of rising juvenile violence, should this Court radically change criminal sentencing policy? The majority's tunnel view, which focuses on the age of the murderer without considering the number or brutality of the crimes, removes sentencing discretion from the trial court—the opposite of what United States Supreme Court precedents require. Further, limiting punishment based solely on age ignores other important circumstances. What about those who commit school shootings? Or those on a multiday crime spree who commit multiple murders on separate occasions? The majority's fixation on age to the exclusion of all else says all juvenile murderers will be treated the same—parole eligible after twenty-five years.

¶ 88        What is "cruel" in this case is not the punishment for the crimes but the tragic irreparable loss because of the murder of a young man and his pregnant girlfriend and the ongoing anguish of the victims' families. Now the families are left to wonder: For which murder is defendant escaping punishment?

¶ 89        Here the trial court did precisely what the constitution and relevant statutes required it to do: it considered the fact that defendant was not yet eighteen years old at the time of the murders and other mitigating factors. It then appropriately weighed

these factors against the senselessness of the murders and number of young people killed. In concluding it should not ignore the fact that defendant was responsible for the murder of more than one person, the trial court exercised its discretion to punish defendant for both murders. As it observed, "there is no buy one, get one" for murders. The trial court's imposition of a separate consecutive sentence for the second murder is not unconstitutional under either the federal or state constitutions. The trial court's decision should be upheld. I respectfully dissent.

¶ 90        This case stems from the premeditated murders of Eric Carpenter and his pregnant girlfriend, Kelsey Helton. According to defendant, prior to the murders, defendant and his acquaintance Joshua Ballard had multiple conversations about robbing Carpenter, who was a known drug dealer. At one point, Ballard stated that they would have to kill Carpenter to avoid being identified after the robbery. Defendant offered to provide a handgun he had stolen to complete the killing. Additionally, defendant informed one of his friends, Liz Perry, about the plan to rob and murder Carpenter.

¶ 91        Ballard and Carpenter established the date and time of the "sale," determining they would meet behind a furniture store on 7 August 2001. That evening, defendant drove Ballard and another friend, Jerome Branch, to the furniture store parking lot. Once they arrived, they met Carpenter but also saw a marked police vehicle in the parking lot. They decided to move the deal to Carpenter's apartment, where his

pregnant girlfriend, Helton, also resided.

¶ 92        After arriving at the apartment complex, everyone went inside Carpenter's apartment. Helton left the apartment but came back in, and the conversation turned to her pregnancy. While the evidence on what transpired next is conflicting,[1] defendant says that Ballard ordered Carpenter and Helton to kneel in the kitchen facing the wall and Carpenter and Helton were both shot and killed while the drugs were collected. Thereafter, defendant and Ballard met in the parking lot to split the stolen drugs. Later, they met with friends, including Perry, where they drank alcohol and smoked marijuana laced with cocaine. At some point, defendant told Perry about the robbery and murders.

¶ 93        A few days later, defendant was arrested in connection with the events. Defendant was charged with two counts of first-degree murder, two counts of robbery with a dangerous weapon, and one count of conspiracy to commit robbery with a dangerous weapon. Defendant pled guilty to all charges. He was sentenced to, inter alia, two consecutive terms of life without parole for the murder offenses.

¶ 94        After the Supreme Court of the United States decided *Miller v. Alabama*, 567 U.S. 460, 132 S. Ct. 2455 (2012), defendant filed a Motion for Appropriate Relief

---

[1] "[Ballard] testified that he went to Carpenter's apartment only for a drug deal, and that [defendant's] robbery and murder of the victims was unexpected. He stated that he did not even know [defendant] had a gun with him that night." *State v. Ballard*, 180 N.C. App. 637, 640, 638 S.E.2d 474, 477 (2006).

(MAR), arguing that the Supreme Court's decision in *Miller* rendered his sentence of life without parole unconstitutional since he was a juvenile at the time the crimes were committed.[2]

The resentencing hearing occurred when defendant was thirty-four years old and had been incarcerated for around seventeen years. At resentencing, the State offered evidence, including victim impact testimony, showing the impact of the murders on Helton and Carpenter's families. Defendant offered evidence showing the efforts he had taken in prison to reform his conduct. After considering the evidence, the trial court recounted the devastation to the victims' families as well as the improvement defendant had made while incarcerated. The trial court issued findings on the circumstances surrounding the murders as well as the mitigating factors, which included defendant's age and time in prison. Having the ability to learn of defendant's improvements while incarcerated, the trial court concluded that "defendant is neither in [sic] incorrigible nor irredeemable." As for sentencing, the trial court stated that "there are not bogos [for murder]. There is no buy one, get one. There is no kill one, get one. There is not combination of sentences. There is no consolidation of sentences." The trial court sentenced defendant to two consecutive sentences of life with the possibility of parole, one for the murder of Carpenter

---

[2] At the time of the offense, defendant was approximately seventeen years and four months old.

followed by one for the murder of Helton. According to this sentence, defendant must spend at least fifty years in prison. *See* N.C.G.S. § 15A-1340.19A (2021) (providing that life imprisonment with parole means that a defendant must serve at least twenty-five years incarcerated for an offense before becoming eligible for parole).

¶ 96          Defendant appealed to the Court of Appeals, arguing (1) that his "consecutive life with parole sentences are excessive and violate the Eighth Amendment," and (2) that his "consecutive life with parole sentences are excessive and violate Article I, Section 27 of the North Carolina Constitution." The Court of Appeals generally agreed, holding that "under Eighth Amendment jurisprudence: (1) *de facto* [life without parole] sentences imposed on juveniles may run afoul of the Eighth Amendment; (2) such punishments may arise out of aggregated sentences; and (3) a sentence that provides for no opportunity for release for 50 or more years is cognizable as a *de facto* [life without parole] sentence." *State v. Kelliher*, 273 N.C. App. 616, 644, 849 S.E.2d 333, 352 (2020). Because the Court of Appeals recognized that this Court has precedents analyzing the cruel and unusual punishment clauses the same under the state and federal constitutions, the Court of Appeals stated that its "analysis . . . applies equally to both" constitutional claims. *Id.* at 633 n.10, 849 S.E.2d at 344 n.10.

¶ 97          The State filed a notice of appeal based upon a constitutional question and, in the alternative, filed a petition for discretionary review with this Court for review of the Court of Appeals' opinion. Defendant filed a conditional petition for discretionary

review. This Court dismissed ex mero motu the State's notice of appeal but allowed both petitions for discretionary review to determine whether the Court of Appeals erred in concluding that defendant's sentence violated both the United States Constitution and the North Carolina Constitution.

¶ 98        On appeal, this Court "review[s] constitutional issues *de novo." State v. Whittington,* 367 N.C. 186, 190, 753 S.E.2d 320, 323 (2014). Additionally, where a trial court imposes a sentence within the applicable statutory limit, the trial court's imposition of the sentence is reviewed for abuse of discretion. *State v. Melton*, 307 N.C. 370, 380–81, 298 S.E.2d 673, 680–81 (1983).

¶ 99        All political power resides in the people, N.C. Const. art. I, § 2, and the people act through the General Assembly, *State ex rel. Ewart v. Jones,* 116 N.C. 570, 570, 21 S.E. 787, 787 (1895) ("[T]he sovereign power resides with the people and is exercised by their representatives in the General Assembly."). Unlike the Federal Constitution, "a State Constitution is in no matter a grant of power. All power which is not limited by the Constitution inheres in the people, and an act of a State legislature is legal when the Constitution contains no prohibition against it." *McIntyre v. Clarkson,* 254 N.C. 510, 515, 119 S.E.2d 888, 891 (1961) (quoting *Lassiter v. Northampton Cnty. Bd. of Elections,* 248 N.C. 102, 112, 102 S.E.2d 853, 861 (1958), *aff'd,* 360 U.S. 45, 79 S. Ct. 985 (1959)); *see also Jones,* 116 N.C. at 570–71, 21 S.E. at 787 ("The only limitation upon this power is found in the organic law, as declared by the delegates

of the people in convention assembled from time to time."). The presumptive constitutional power of the General Assembly to act is consistent with the principle that a restriction on the General Assembly is in fact a restriction on the people. *Baker v. Martin,* 330 N.C. 331, 336, 410 S.E.2d 887, 890 (1991) ("[G]reat deference will be paid to acts of the legislature—the agent of the people for enacting laws." (quoting *State ex rel. Martin v. Preston,* 325 N.C. 438, 448, 385 S.E.2d 473, 478 (1989))). Thus, this Court presumes that legislation is constitutional, and a constitutional limitation upon the General Assembly must be express and demonstrated beyond a reasonable doubt. *E.g., Hart v. State,* 368 N.C. 122, 126, 774 S.E.2d 281, 284 (2015).

¶ 100        Further, "[t]here should be no doubt that the principle of separation of powers is a cornerstone of our state and federal governments." *State ex rel. Wallace v. Bone*, 304 N.C. 591, 601, 286 S.E.2d 79, 84 (1982). Understanding the prescribed powers of each branch, as divided between the branches historically and by the text itself, is the basis for stability, accountability, and cooperation within state government. *See State v. Emery*, 224 N.C. 581, 584, 31 S.E.2d 858, 861 (1944) ("[Constitutions] should receive a consistent and uniform construction . . . even though circumstances may have so changed as to render a different construction desirable."). Because that stability "instills public confidence in governmental actions," and because "[a] violation of separation of powers occurs when one branch of government exercises the

power reserved for another branch of government," this Court must exercise judicial restraint and refrain from usurping the General Assembly's policymaking role. *State ex rel. McCrory v. Berger*, 368 N.C. 633, 651, 660, 781 S.E.2d 248, 260, 265 (2016) (Newby, J., concurring in part and dissenting in part).

¶ 101 The North Carolina General Statutes address the sentencing requirements for juvenile offenders who commit first-degree murder. These statutes were passed to comply with the Eighth Amendment juvenile cases of the Supreme Court of the United States. This Court has recently upheld this statutory scheme. *See State v. James*, 371 N.C. 77, 99, 813 S.E.2d 195, 211 (2018). Specifically, the following statutes are relevant. N.C.G.S. § 15A-1340.19A provides that

> a defendant who is convicted of first degree murder, and who was under the age of 18 at the time of the offense, shall be sentenced in accordance with this Part. For the purposes of this Part, "life imprisonment with parole" shall mean that the defendant shall serve a minimum of 25 years imprisonment prior to becoming eligible for parole.

N.C.G.S. § 15A-1340.19A. Further, N.C.G.S. § 15A-1340.19B provides, in relevant part, as follows:

> (a) In determining a sentence under this Part, the court shall do one of the following:
>
> > (1) If the sole basis for conviction of a count or each count of first degree murder was the felony murder rule, then the court shall sentence the defendant to life imprisonment with parole.

   (2)  If the court does not sentence the defendant pursuant to subdivision (1) of this subsection, then the court shall conduct a hearing to determine whether the defendant should be sentenced to life imprisonment without parole, as set forth in [N.C.]G.S. [§] 14-17 [(2021)], or a lesser sentence of life imprisonment with parole.

  . . . .

  (c) The defendant or the defendant's counsel may submit mitigating circumstances to the court, including, but not limited to, the following factors:

   (1)  Age at the time of the offense.

   (2)  Immaturity.

   (3)  Ability to appreciate the risks and consequences of the conduct.

   (4)  Intellectual capacity.

   (5)  Prior record.

   (6)  Mental health.

   (7)  Familial or peer pressure exerted upon the defendant.

   (8)  Likelihood that the defendant would benefit from rehabilitation in confinement.

   (9)  Any other mitigating factor or circumstance.

N.C.G.S. § 15A-1340.19B (2021). Moreover, N.C.G.S. § 15A-1340.19C(a) provides

that a trial court

shall consider any mitigating factors in determining whether, based upon all the circumstances of the offense and the particular circumstances of the defendant, the defendant should be sentenced to life imprisonment with parole instead of life imprisonment without parole. The order adjudging the sentence shall include findings on the absence or presence of any mitigating factors and such other findings as the court deems appropriate to include in the order.

N.C.G.S. § 15A-1340.19C(a) (2021). Further, N.C.G.S. § 15A-1354(a) provides that "[w]hen multiple sentences of imprisonment are imposed on a person at the same time, . . . the sentences may run either concurrently or consecutively, as determined by the court." N.C.G.S. § 15A-1354(a) (2021).[3]

¶ 102    Thus, under our statutory scheme, the trial court considers all of the facts and circumstances of a juvenile's case, including the juvenile's age, and exercises its discretion to determine if the juvenile's crime should be punished by life without parole or life with parole. *See James*, 371 N.C. at 99, 813 S.E.2d at 211 (upholding our statutory scheme). Simply put, the trial court has the discretion to sentence an offender convicted of multiple offenses and can choose to impose those sentences consecutively       or       concurrently.       As       such,       N.C.G.S §§ 15A-1340.19A, -1340.19B, -1340.19C, and -1354 combine to provide the trial court

---

[3] Contrary to the majority's assertion, this statutory scheme demonstrates that the General Assembly has not been silent on how to sentence multiple counts of premeditated murder committed by a juvenile defendant. The General Assembly simply has not enacted the majority's preferred scheme.

with the authority to impose sentences of life imprisonment either with or without

parole on juveniles who commit multiple first-degree murders as well as the

discretion to run those sentences concurrently or consecutively. The trial court's

discretionary decision will depend on the facts of each case and should be influenced

by the number of murders that a defendant committed. *See* N.C.G.S §§ 15A-1340.19B,

-1340.19C; *see also James*, 371 N.C. at 99, 813 S.E.2d at 211.

¶ 103 Defendant appears to characterize his complaint as a "facial challenge" to

portions of the relevant statutory sentencing scheme. When raising a constitutional

challenge, the party raising the challenge can bring a facial or as applied challenge

to the allegedly unconstitutional act. Understanding the difference between these two

challenges is critically important.

> [A]n as-applied challenge represents a [party's] protest
> against how a statute was applied in the particular context
> in which plaintiff acted or proposed to act, while a facial
> challenge represents a [party's] contention that a statute is
> incapable of constitutional application in any context. This
> distinction impacts the inquiry a court must make to
> determine the validity of a challenged statute, because only
> in as-applied challenges are facts surrounding the [party's]
> particular circumstances relevant. Furthermore, if
> successful in an as-applied claim the [party] may enjoin
> enforcement of the statute only against himself or herself
> in the objectionable manner, while a successfully mounted
> facial attack voids the statute in its entirety and in all
> applications.

*Frye v. City of Kannapolis*, 109 F. Supp. 2d 436, 439 (M.D.N.C. 1999) (citations

omitted). Additionally, facial challenges are the most difficult on which to prevail

given the heavy burden on the challenger to show that there are no circumstances under which a statute would be constitutional or valid. *State v. Grady*, 372 N.C. 509, 564, 831 S.E.2d 542, 581 (2019) (Newby, J., dissenting).

¶ 104        The majority notes that "[defendant] did not raise an as-applied claim asserting that his sentence was constitutionally disproportionate based on the particular circumstances of his case" but rather raises only a "facial" challenge. Clearly, however, the challenge is "as applied" to his sentence under the unique circumstances of defendant's case. There is no statute which defendant challenges facially. For example, the statute which authorizes the trial court to exercise discretion as to whether to impose a consecutive or concurrent sentence is not specifically a statute addressed to juvenile sentences. Thus, defendant actually challenges the use of consecutive sentencing for a juvenile who commits more than one murder if the trial court expressly finds that juvenile not to be "incorrigible or irredeemable." As such, this is an as-applied challenge.[4]

¶ 105        Defendant first argues the trial court's imposition of two consecutive life with parole sentences violates the Eighth Amendment to the United States Constitution. The Eighth Amendment provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const.

---

[4] In *State v. Conner*, an analogous case challenging similar sentencing provisions, the defendant clearly asserts an as-applied challenge. *See State v. Conner*, 2022-NCSC-79, ¶ 19.

amend. VIII. Recently, the Supreme Court of the United States has used this provision to address the sentencing of juveniles. *See Jones v. Mississippi*, 141 S. Ct. 1307, 1318–19 (2021); *Montgomery v. Louisiana*, 577 U.S. 190, 212–13, 136 S. Ct. 718, 736 (2016); *Miller*, 567 U.S. at 479, 132 S. Ct. at 2469; *Graham v. Florida*, 560 U.S. 48, 82, 130 S. Ct. 2011, 2034 (2010); *Roper v. Simmons*, 543 U.S. 551, 578, 125 S. Ct. 1183, 1200 (2005); *see also James*, 371 N.C. at 99, 813 S.E.2d at 211 (upholding the legislature's statutory response to the precedents of the Supreme Court regarding a juvenile defendant who was sentenced to life without parole for first-degree murder). According to the Supreme Court, the imposition of a life without parole sentence upon a juvenile defendant who has been convicted of premeditated murder complies with the Eighth Amendment so long as the trial court has the discretion to consider the defendant's youth as a sentencing factor.

¶ 106        In *Roper v. Simmons*, the Supreme Court considered the constitutionality of imposing the death penalty on a juvenile offender. *Roper*, 543 U.S. at 555, 125 S. Ct. at 1187. In that case, the defendant, who was seventeen years old when he committed the murder, was convicted of first-degree murder and sentenced to death. *Id.* at 556–58, 125 S. Ct. at 1188–89. Considering the sentence in light of the Eighth and Fourteenth Amendments to the United States Constitution, the Supreme Court recounted the differences between juveniles and adults. *Id.* at 569, 125 S. Ct. at 1195. The Court noted that juveniles are less mature, more vulnerable or susceptible to

peer pressure, and have "character [that is] not as well formed as that of an adult." *Id.* at 569–70, 125 S. Ct. at 1195. Because juveniles have a "diminished culpability" as compared to adults, the Supreme Court concluded that any penological justifications for imposing the death penalty would "apply to [juveniles] with lesser force than to adults." *Id.* at 571, 125 S. Ct. at 1196. Thus, the Supreme Court held that "[t]he Eighth and Fourteenth Amendments forbid imposition of the death penalty on offenders who were under the age of eighteen when their crimes were committed." *Id.* at 578, 125 S. Ct. at 1200.

¶ 107    Thereafter, in *Graham v. Florida,* the Court considered "whether the Constitution permits a juvenile offender to be sentenced to life in prison without parole for a nonhomicide crime." *Graham*, 560 U.S. at 52–53, 130 S. Ct. at 2017–18. The Court noted that analyzing challenges under the Eighth Amendment required the Court to evaluate whether the sentence was "disproportionate to the crime." *Id.* at 59, 130 S. Ct. at 2021. The Court emphasized the difference between homicide offenses and all other offenses, with nonhomicide being the category at issue. *Id.* at 69, 130 S. Ct. at 2027. Thus, the Court distinguished between juveniles depending on the type of crime committed. The Court did not look solely at the defendant's age but acknowledged that the nature and severity of the crime impacted its analysis. In specifically looking at juveniles who committed nonhomicide offenses, the Court determined that "penological theory is not adequate to justify life without parole for

juvenile nonhomicide offenders." *Id.* at 74, 130 S. Ct. at 2030. The Court stated that a juvenile nonhomicide offender must be given "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Id.* at 75, 130 S. Ct. at 2030. As such, the Court held that "[t]he Constitution prohibits the imposition of a life without parole sentence on a juvenile offender who did not commit homicide." *Id.* at 82, 130 S. Ct. at 2034. Notably, "*Graham* did not prohibit life without parole for offenders who were under 18 and committed homicide." *Jones*, 141 S. Ct. at 1314 (emphasis omitted).

¶ 108     Later the Court revisited juvenile sentencing, this time in the context of statutorily mandated life without parole sentences for juveniles who committed homicide offenses. *Miller v. Alabama* involved two defendants, both of whom were fourteen years old at the time of the offenses and had been sentenced to life without parole under mandatory sentencing schemes for homicide offenses. *Miller*, 567 U.S. at 465–69, 132 S. Ct. at 2461–63. The Supreme Court recounted *Roper* and *Graham* as cases that "establish[ed] that children are constitutionally different from adults for purposes of sentencing." *Id.* at 471, 132 S. Ct. at 2464. The Court noted that any mandatory sentencing schemes applying to juvenile offenders, including the schemes at issue here, "remov[ed] youth from the balance" and "prohibit[ed] a sentencing authority from assessing whether the law's [now] harshest term of imprisonment proportionally punishes a juvenile offender." *Id.* at 474, 132 S. Ct. at 2466. The Court

expressed that trial courts should have discretion to consider a juvenile's chronological age, maturity, appreciation of risks and consequences, home environment, and susceptibility to peer pressure. *Id.* at 477–78, 132 S. Ct. at 2468. It held "that the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." *Id.* at 479, 132 S. Ct. at 2469. The Court expressly declined to consider the argument of whether the Eighth Amendment "requires a categorical bar on life without parole for juveniles." *Id.* at 479, 132 S. Ct. at 2469. Instead, the Court's conclusion required that trial courts have discretionary sentencing authority so they may examine a juvenile's age when determining his sentence.

¶ 109        Thereafter, the Court again considered a juvenile sentencing case to decide the narrow issue of "whether [the holding in *Miller*] is retroactive to juvenile offenders whose convictions and sentences were final when *Miller* was decided." *Montgomery*, 577 U.S. at 194, 136 S. Ct. at 725. The Court reiterated the principle from *Roper*, *Graham*, and *Miller* that the age that an offender commits a crime, i.e., his or her status as a juvenile at the time of the offense, is a sentencing factor to be considered by the sentencing court. *Id.* at 213, 136 S. Ct. at 736. The Court concluded that because *Miller* had announced a substantive rule about juvenile sentencing for homicide offenses, "*Miller*'s prohibition on mandatory life without parole for juvenile offenders . . . must be retroactive." *Id.* at 206, 136 S. Ct. at 732.

¶ 110   Most recently, the Supreme Court revisited juvenile sentencing in *Jones v. Mississippi*. There the defendant, a fifteen-year-old, murdered his grandfather and attempted to cover up his own role in the crime. *Jones*, 141 S. Ct at 1312. The defendant was originally sentenced to mandatory life without parole, but in the wake of *Miller*, the Mississippi Supreme Court concluded that *Miller* applied retroactively to the defendant's sentence and remanded the case for resentencing. *Id.* At the end of the resentencing hearing, the trial court acknowledged it had discretion to impose a sentence of less than life without parole but chose not to do so given the relevant factors at issue concerning the defendant's culpability. *Id.* at 1313.

¶ 111   When the case came before the Supreme Court of the United States, the defendant argued that *Miller* mandated that a trial judge must either "(i) make a separate factual finding of incorrigibility, or (ii) at least provide an on-the-record sentencing explanation with an 'implicit finding' of permanent incorrigibility" in order to sentence a juvenile defendant to life without parole *Id.* The Supreme Court plainly rejected the defendant's challenge and held that a sentencing judge is not required to determine whether a juvenile defendant is incorrigible before sentencing that defendant to life without parole. *Id.* at 1318–19.

¶ 112   In doing so, the Supreme Court reviewed its recent cases involving the Eighth Amendment, stating that "*Miller* cited *Roper* and *Graham* for a simple proposition: Youth matters in sentencing. And because youth matters, *Miller* held that a

sentencer must have discretion to consider youth before imposing a life-without-parole sentence." *Id.* at 1316. More specifically, the Court noted that "*Miller* repeatedly described youth as a *sentencing factor* akin to a *mitigating circumstance*." *Id.* at 1315 (emphases added). The Court emphasized that this requirement in *Miller*—that there must be a discretionary sentencing procedure for imposing life without parole on a juvenile—did not extend beyond that, meaning *Miller* did not require a court to make a finding of permanent incorrigibility before imposing a sentence of life without parole. *Id.* at 1317–18. The Court elaborated that "[t]he key assumption of both *Miller* and *Montgomery* was that discretionary sentencing allows the sentencer to consider the defendant's youth, and thereby helps ensure that life-without-parole sentences are imposed only in cases where that sentence is appropriate in light of the defendant's age." *Id.* at 1318. *Miller* and *Montgomery* did not, however, require a finding of incorrigibility. *Id.*

¶ 113        The Court stated that the holding in *Jones* did not overrule *Miller* or *Montgomery*. "*Miller* held that a State may not impose a mandatory life-without-parole sentence on a murderer under 18. Today's decision does not disturb that holding. *Montgomery* later held that *Miller* applies retroactively on collateral review. Today's decision likewise does not disturb that holding." *Id.* at 1321. The Court noted the importance of analyzing *Miller* and *Montgomery* by looking to "their explicit language [to address] the precise question before" the Court. *Id.* at 1322. The Court

refused to, however, go beyond the parameters of *Miller* or *Montgomery* to impose a finding akin to what the defendant argued was necessary. Importantly, the Court reiterated that

> [d]etermining the proper sentence in [a homicide] case raises profound questions of morality and social policy. The States, not the federal courts, make those broad moral and policy judgments in the first instance when enacting their sentencing laws. And state sentencing judges and juries then determine the proper sentence in individual cases in light of the facts and circumstances of the offense, and the background of the offender.
>
> Under our precedents, this Court's more limited role is to safeguard the limits imposed by the Cruel and Unusual Punishments Clause of the Eighth Amendment.

*Id.* Thus, the Court noted that state legislatures set sentencing policies and that trial courts effectuate those policies. *Id.* at 1323. It held that a determination of incorrigibility is not required in order for a trial court to sentence a juvenile defendant who had been convicted of murder to life without parole. *Id.* at 1313.

¶ 114        The cases summarized above reveal the following rule: the imposition of a life without parole sentence upon a juvenile defendant who has been convicted of premeditated murder is constitutionally permissible so long as the relevant statutory scheme provides the trial court with the discretion to consider the defendant's youth as a sentencing factor. As *Jones* made clear, the Supreme Court's decisions in *Graham*, *Roper*, and *Miller* answered limited questions, and at most, stood for the proposition that age is a factor which a trial court should be permitted to consider

when sentencing a juvenile defendant. *See id.* at 1316 (*Miller* required " 'only that a sentencer follow a certain process—considering an offender's youth and attendant characteristics—before imposing' a life without parole sentence." (quoting *Miller*, 567 U.S. at 483, 132 S. Ct. at 2471)). Further, at no point has the Supreme Court suggested that a defendant's age must be the predominant sentencing factor. As such, a trial court need not determine that a juvenile defendant is incorrigible or irredeemable before using its discretion to sentence the defendant to life imprisonment without the possibility of parole. *See id.* at 1313. Rather, such a sentence is constitutionally permissible so long as the trial court is permitted to consider the juvenile defendant's age and attendant characteristics.

¶ 115        Here in compliance with *Miller*, North Carolina's relevant statutory scheme provides trial courts with the discretion to consider youth as a factor when sentencing juvenile defendants. This sentencing scheme was recently upheld by this Court. *See James*, 371 N.C. at 99, 813 S.E.2d at 211. The trial court in the present case complied with the statutory scheme by using its discretion to consider defendant's youth in addition to several other factors. In exercising its discretion, however, it determined that two consecutive life with parole sentences were appropriate under these circumstances.

¶ 116        The trial court thus exercised the exact type of judgment that *Miller* requires. *See Miller*, 567 U.S. at 465, 132 S. Ct. at 2460. The trial court did not impose a

mandatory sentence but rather made an individualized determination in defendant's sentencing by considering defendant's age at the time of the offenses and his ability to be rehabilitated. The trial court balanced those factors by considering the seriousness of the offenses here, i.e., the fact that defendant murdered multiple people. The trial court emphasized "that there are not bogos [for murder]. There is no buy one, get one. There is no kill one, get one. There is not combination of sentences. There is no consolidation of sentences." Thus, though the trial court, which had the benefit of hearing of defendant's progress during his roughly seventeen years of incarceration, determined that defendant could likely be rehabilitated, it chose to impose consecutive sentences to account for the multiple cold-blooded murders for which defendant was responsible.[5] Under Supreme Court precedents, such a discretionary decision is constitutionally permissible.[6]

¶ 117        Moreover, defendant's sentences in the present case also comply with the

---

[5] It must be noted that the task of a trial court during resentencing when a defendant has established a progress record during his period of incarceration is very different than that of a court who is sentencing someone who recently committed the crime as a juvenile and has no record in prison. Should or could a trial court determine a juvenile to be incorrigible, and even if it must, should the trial court tell a juvenile its view at sentencing? While the Supreme Court recognized that as part of the trial court's consideration, it must consider all the factors including its view of redeemability, it could be counterproductive and cruel to say, "Juvenile defendant, I find you incorrigible and irredeemable."

[6] The majority believes if a defendant is rehabilitated, then he should be free from incarceration. While rehabilitation is an important factor in granting parole, there are others as well, such as the seriousness of the crime, which impacts what is just punishment and deterrence. The trial court here considered all of the relevant factors.

North Carolina Constitution. Predating the drafting of the Eighth Amendment by thirteen years, North Carolina, like its neighboring original states, derived its prohibition against cruel or unusual punishments from the English Declaration of Rights. *See* John V. Orth and Paul Martin Newby, *The North Carolina State Constitution* 84 (2d ed. 2013) [hereinafter *State Constitution*]. Article I, Section 27 of the North Carolina Constitution provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel or unusual punishments inflicted." N.C. Const. art. I, § 27.

¶ 118        Like other provisions in the Declaration of Rights, this provision is given clarity elsewhere in the constitution. Specifically, Article XI, Section 1 limits criminal punishments to those specifically listed, including "death" and "imprisonment." N.C. Const. art. XI, § 1. "Because expressly listed here, none can possibly be considered 'cruel or unusual' within the prohibition of Article I, Section 27." *State Constitution* 193; *see also id.* ("[W]hatever is greater than has ever been prescribed, or known, or inflicted, must be excessive, cruel, and unusual."); *Leandro v. State*, 346 N.C. 336, 352, 488 S.E.2d 249, 258 (1997) ("[A] constitution cannot violate itself."). Notably, the United States Constitution does not have a listing of acceptable punishments.

¶ 119        Article XI, Section 2, recognizing the needed balance between justice and mercy, limits the use of the death penalty to "murder, arson, burglary, and rape . . . if the General Assembly shall so enact." N.C. Const. art. XI, § 2. The General

Assembly, generally in response to Supreme Court decisions, has limited the death penalty to premeditated first-degree murder with aggravating factors.[7]

¶ 120          Thus, the express language of Article XI, Section 2 justifies the limitation on the death penalty by recognizing that justice can be served for lesser crimes by penalties other than the death penalty. While defendants may "reform," the provision says nothing about the length of prison sentences. Under the state constitution within its express constraints, the General Assembly may enact whatever sentencing policy it deems best. Given its history, Article I, Section 27 applies mainly to judges who were traditionally granted broad discretion in sentencing matters. The General Assembly, on the other hand, needs broad authority to "regulate criminal procedure and to prescribe the punishment of crimes" so it is "free to respond to new social threats and to reflect the changing perceptions of relative degrees of seriousness in criminal offenses." *State Constitution* 84. Therefore, the relevant statutory scheme, which permits trial courts to impose consecutive life with parole sentences for multiple convictions of first-degree murder, complies with our constitution.

¶ 121          Though the constitutional definition of cruel or unusual punishment explicitly

---

[7] Contrary to the majority's argument, Article XI, Section 2 provides no support for its ruling. Likewise, Article I, Section 1 and the provisions regarding education, Article I, Section 15 and Article IX, are not relevant in the analysis of what is "cruel" under Article I, Section 27. Notably, the majority ignores the relevant state constitutional provisions which clearly define what is cruel or unusual punishment. It instead focuses on the conjunctive "or," which is not relevant to a determination of what punishments are prohibited by our state constitution.

provides for greater punishments under our state constitution, this Court, in recognition of the supremacy of the Federal Constitution, has held that claims under the Eighth Amendment and Article I, Section 27 provide the same protection and are analyzed in the same way. *See State v. Green*, 348 N.C. 588, 603, 502 S.E.2d 819, 828 (1998), *cert. denied*, 525 U.S. 1111, 119 S. Ct. 883 (1999).[8] This Court examines claims under the Eighth Amendment as well as under Article I, Section 27 "in light of the general principles enunciated by this Court and the Supreme Court guiding cruel and unusual punishment analysis." *Id.*; *see State v. Peek*, 313 N.C. 266, 275–76, 328 S.E.2d 249, 255 (1985) (reviewing an Eighth Amendment and Article I, Section 27 claim under the same standard and ultimately determining that a defendant's sentence did not violate either constitution); *State v. Fulcher*, 294 N.C. 503, 525, 243 S.E.2d 338, 352 (1978) (concluding a punishment was neither cruel nor unusual under the state and federal constitutions without providing a separate analysis for reaching its determination). Moreover, this Court has expressly declined to adopt a

---

[8] "[T]he United States Constitution provides a constitutional floor of fundamental rights guaranteed all citizens of the United States, while the state constitutions frequently give citizens of individual states basic rights in addition to those guaranteed by the United States Constitution." *State v. Jackson*, 348 N.C. 644, 648, 503 S.E.2d 101, 103 (1998). Thus, "the only significant issue for this Court when interpreting a provision of our state Constitution paralleling a provision of the United States Constitution will always be whether the state Constitution guarantees additional rights to the citizen above and beyond those guaranteed by the parallel federal provision." *Id.* Though "[i]n construing the North Carolina Constitution, this Court is not bound by the decisions of . . . the United States Supreme Court," this Court gives "the most serious consideration to those decisions." *Id.*, 503 S.E.2d at 104.

reading of Article I, Section 27 that would provide broader protection than the Eighth Amendment as "research reveals neither subsequent movement toward such a position by either this Court . . . nor any compelling reason to adopt such a position." *Green*, 348 N.C. at 603 n.1, 502 S.E.2d at 828 n.1. While the majority disparages our holding in *Green*, this Court recently cited with approval its analytical approach addressing the cruel and/or unusual punishment clauses. *See James*, 371 N.C. at 78, 813 S.E.2d at 198.

¶ 122        In addition to the explicit statements in *Green* confirming that this Court analyzes cruel or unusual punishment claims the same as Eighth Amendment claims, doing so is consistent with the way this Court has analyzed other criminal-law related provisions of the North Carolina Constitution. *See, e.g., State v. Jackson*, 348 N.C. 644, 653–54, 503 S.E.2d 101, 107 (1998) (choosing to analyze a confrontation claim under the North Carolina Constitution in the same way as a Confrontation Clause claim under the United States Constitution); *State v. Lawson*, 310 N.C. 632, 646, 314 S.E.2d 493, 502 (1984) (stating that the Court was not inclined to interpret the state and federal constitutions differently in the context of an equal protection challenge to the death penalty statute).

¶ 123        Historically, this Court has consistently deferred to the legislature's criminal policymaking authority and determined that unless a statute for sentencing is plainly unconstitutional, a judge may impose any sentence within the statutorily proscribed

limits without violating the cruel or unusual punishments clause. *See, e.g.*, *State v. Lovelace*, 271 N.C. 593, 594, 157 S.E.2d 81, 81–82 (1967) (stating that a sentence that does not exceed the maximum sentence prescribed by statute does not constitute cruel or unusual punishment and thus does not violate the North Carolina Constitution); *see also State v. Ysaguire*, 309 N.C. 780, 786, 309 S.E.2d 436, 441 (1983) ("Only in exceedingly unusual non-capital cases will the sentences imposed be so grossly disproportionate as to violate the Eighth Amendment's proscription of cruel and unusual punishment. The imposition of consecutive life sentences, standing alone, does not constitute cruel and unusual punishment."). We have recognized that "it is the role of the legislature and not the courts to decide the proper punishment for individuals convicted of a crime." *Green*, 348 N.C. at 605, 502 S.E.2d at 829.

¶ 124 Here running defendant's sentences consecutively to allow him parole eligibility at sixty-seven years of age does not violate the North Carolina Constitution for the same reasons that it does not violate the Eighth Amendment. Established precedents from this Court as well as the Supreme Court of the United States do not mandate a defendant's release at a certain age but instead require the trial court to consider youth as a factor during sentencing. Because the trial court in the present case considered defendant's age during resentencing and imposed a statutorily authorized sentence, defendant's sentence does not violate the North Carolina

Constitution.[9] Nor does the imposition of defendant's sentence within the statutory range constitute an abuse of discretion.

¶ 125    To enact its desired criminal penal policy despite the binding precedents that would preclude the majority's end result, the majority discards our holding in *Green* by reasoning that its "time has passed." Additionally, the majority ignores provisions of the North Carolina Constitution that specifically define cruel or unusual punishments and cites provisions that have nothing to do with punishment. It uses those provisions in ways that have no basis in history or in the text of the provisions. Under our state constitution, the General Assembly is tasked with determining criminal justice policy. The majority plainly usurps the role of the legislature and acts as a policymaker, weighing various public policy considerations to reach its desired result. It establishes its preferred policy by setting an arbitrary forty-year limit for sentences, effectively mandating one sentence of life with parole regardless of the number or severity of the crimes. As precedents have consistently recognized, state legislatures are the proper bodies to "make those broad moral and policy judgments in the first instance when enacting their sentencing laws." *Jones*, 141 S. Ct. at 1322. Under existing precedents, the Court's "more limited role is to safeguard the limits imposed by" the Eighth Amendment and Article I, Section 27, not to create policy. *Id.*

---

[9] Of note, the imposed sentence would allow for defendant's release during a natural lifespan. *See generally* N.C.G.S. § 8-46 (2021) (providing life expectancy ages to be used as evidence).

Nonetheless, the majority enacts its policy decision to grant more leniency to convicted murderers, undermining the General Assembly's role of protecting the people of our state.

¶ 126          The majority today places itself in the General Assembly's criminal justice policymaking role and strips trial courts of their discretionary sentencing authority. Despite the Supreme Court's emphasis in *Miller* that trial courts must be afforded the discretion to consider a juvenile offender's age as a sentencing factor, the majority now removes that discretion from the trial courts in this state. Specifically, the majority holds as follows:

> [I]t violates both the Eighth Amendment to the United States Constitution and article I, section 27 of the North Carolina Constitution to sentence a juvenile homicide offender who has been determined to be "neither incorrigible nor irredeemable" to life without parole. Furthermore, we conclude that any sentence or combination of sentences which, considered together, requires a juvenile offender to serve more than forty years in prison before becoming eligible for parole is a de facto sentence of life without parole within the meaning of article I, section 27 of the North Carolina Constitution because it deprives the juvenile of a genuine opportunity to demonstrate he or she has been rehabilitated and to establish a meaningful life outside of prison.

This declaration, however, is not supported by the Supreme Court's Eighth Amendment jurisprudence, the text or history of our state constitution, or any of our prior decisions.

¶ 127          Notably, the majority errs by focusing almost exclusively on the age factor to

the exclusion of the other circumstances including the nature and seriousness of the crime. It ignores that the Supreme Court has held that trial courts must conduct individualized sentencing to determine whether a defendant guilty of premeditated murder should receive life imprisonment with or without parole. The majority determines that a finding by the trial court that defendant is "neither incorrigible nor irredeemable" removes all sentencing discretion from the trial court. The mandatory sentence thus becomes a single sentence of life with parole. The majority then determines that life with parole is capped at forty years and any sentencing beyond that constitutes a de facto life sentence. In the case of multiple murders, as here, it rules that the maximum sentence is the same as the sentence for one murder—parole eligible after twenty-five years.[10]

¶ 128    These policy determinations are for the General Assembly to address, not the courts. The legislative branch is designed to weigh the competing penological

---

[10] Not only does the majority create an arbitrary forty-year cap, but it also usurps the role of the trial court by resentencing defendant in the first instance. In doing so, the majority mandates that defendant become eligible for parole after serving only twenty-five years. It refuses to craft a remedy that will enforce the trial court's decision to punish defendant for the second murder. Interestingly, however, this same majority provides a different remedy in *State v. Conner*, an analogous case published on the same day as the present case. *See State v. Conner*, 2022-NCSC-79, ¶ 64. Pursuant to the majority's ruling in *Conner*, the defendant there could serve the newly established forty-year maximum before becoming parole eligible. *See id.* Thus, a juvenile who committed murder and rape could receive a longer sentence than one who committed multiple murders and robberies. This inconsistency illustrates one of the many reasons why this Court should not legislate criminal sentencing policy. Therefore, the majority here should at least remand this case to the trial court to resentence defendant in the first instance.

considerations. Capping the penalty for multiple murders at one sentence of twenty-five years devalues human life. In the words of the trial court, "[t]here is no buy one, get one" for murder. The majority's holding feeds the rising trend of youth violence, particularly the gang approach of assigning violent actions to younger members because of growing leniency in sentencing. *See* Federal Bureau of Investigation, *2011 National Gang Threat Assessment: Emerging Trends* 18 (2012) ("Gangs have traditionally targeted youths because of . . . their likelihood of avoiding harsh criminal sentencing . . . ."); Daniel Pierce, *High Point Police Report Increase in Juvenile Crimes, Guilford County Schools Sees 8th Death to Gun Violence this School Year*, FOX 8 (Mar. 29, 2022), https://myfox8.com/news/north-carolina/high-point/high-point-police-report-increase-in-juvenile-crimes-guilford-county-schools-sees-8th-death-to-gun-violence-this-school-year/.

¶ 129    The majority's reasoning is especially troubling in cases where a defendant commits multiple murders in separate instances that occur days to months apart. Under the majority's reasoning, time served before parole eligibility seems to be capped at the same forty-year limitation no matter how many murders were committed and no matter how much time elapsed between the murders. What will keep an individual from killing any potential witnesses before he is caught since the time to be served for multiple murders is capped as the same for one murder? In the majority's view, multiple murders do not require longer time in prison before parole

eligibility. Indeed, the majority's opinion may result in more instances of trial courts exercising discretion to impose life without parole to ensure that defendants who commit multiple murders do not gain parole eligibility in the same amount of time as individuals who commit non-homicide offenses.

¶ 130      Further, the majority ignores the difficulty in determining a defendant's incorrigibility at initial sentencing. The resentencing in this case took place seventeen years after the crime. Defendant had ample time to better himself. While his actions are commendable, as recognized by the trial court, in the trial court's view, the positive actions by defendant did not completely offset the fact that he had murdered multiple young people. If the trial court had been sentencing defendant shortly after the crimes had been committed, the trial court would not have had access to defendant's future accomplishments. In most cases, a seventeen-year history will not be available to a sentencing judge. Moreover, even in the worst of circumstances, is it good policy for a judge to tell a juvenile defendant, "You are irredeemable"? What psychological impact would that statement have? Would not such a statement be cruel?

¶ 131      The majority's decision is not supported by the federal or state constitutions. Thus, the majority attempts to find support for its criminal justice policy by looking to other states and foreign countries. However, finding other states or countries with policies that the majority prefers, but with constitutions entirely different than our

own, does not justify ignoring our state constitution's express provisions, violating separation of powers, and stripping our General Assembly of its policymaking authority. This Court is not the proper place to make criminal justice policy. Rather, our task is to apply the law as it already exists. If the majority properly understood this Court's role, it would conclude that the imposition of consecutive life with parole sentences for two counts of first-degree murder does not violate the Eighth Amendment of the United States Constitution or Article I, Section 27 of the North Carolina Constitution. Instead, the majority disregards our constitution and precedents; it assumes the role of the legislature and misuses this Court's authority by enacting its desired criminal justice policies. I respectfully dissent.

Justices BERGER and BARRINGER join in this dissenting opinion.